750 So.2d 242 (1999)
STATE of Louisiana
v.
Eddie GIVENS.
No. 98-KA-0007.
Court of Appeal of Louisiana, Fourth Circuit.
December 8, 1999.
*244 Clive Stafford Smith, Louisiana Crisis Assistance Center, New Orleans, Louisiana, Counsel for Defendant/Appellant.
Harry F. Connick, District Attorney, Orleans Parish, Susan Erlanger Talbot, Assistant District Attorney, New Orleans, Louisiana, Counsel for Plaintiff/Appellee.
Court composed of Judge WILLIAM H. BYRNES, III, Judge JOAN BERNARD ARMSTRONG and Judge DENNIS R. BAGNERIS, Sr.
ARMSTRONG, Judge.

STATEMENT OF THE CASE
The defendant, Eddie Givens, was charged by grand jury indictment with two counts of aggravated rape (Counts 1 and 4), two counts of aggravated burglary (Counts 2 and 5), and two counts of armed robbery (Counts 3 and 6).[1] He pled not guilty. Following trial a twelve-member jury found the defendant guilty as charged on Counts 1, 4, 5, and 6; guilty of simple burglary of an inhabited dwelling on Count 2; and, guilty of attempted simple robbery on Count 3. The trial court denied the defendant's motion for new trial on June 16, 1997; and, after waiving all delays, the defendant was sentenced as follows: (1) on Counts 1 and 4, he was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence; (2) on Count 2, he was sentenced *245 to twelve years at hard labor with the first year to be served without benefit of parole, probation, or suspension of sentence; (3) on Count 3, he was sentenced to three and one-half years at hard labor; (4) on Count 5, he was sentenced to thirty years at hard labor; (5) on Count 6, he was sentenced to ninety-nine years at hard labor without benefit of parole, probation, or suspension of sentence; and (6) the sentences on Counts 1, 2, and 3 were to run concurrently with each other and the sentences on Count 4, 5, and 6 were to run concurrently with each other and consecutively to the sentences on Counts 1, 2, and 3. The defendant now appeals.

STATEMENT OF THE FACTS
On the night of June 22, 1993, officers went to a house in the 2700 block of Octavia Street where D.K.[2] told the police that two men had broken into her home and that one of the men had raped her. She testified that she went to bed at around 9:15 p.m. and that she was awakened when the overhead light in her bedroom came on. She saw two men, one of whom came over, hit her on the arm, and ordered her out of the bed. She testified that this man looked like he was in his late teens or early twenties and that the other intruder looked like he was twelve years old. She stated that the older man was armed with an ice pick and that she saw him flip up the telephone cord but did not actually see him cut it. He demanded money, and the juvenile began looking through her purse and removed thirty dollars in cash. The juvenile left the room, and the older man tied her arms behind her back with the telephone cord. He threw her against a day bed and ordered her to open her legs. He then tied a red kerchief around her mouth, hit her on her the back of the head, and raped her vaginally from the rear. After she heard him call for the juvenile, he jerked her off of the day bed and took her to her daughter's bedroom where the juvenile was going through her daughter's jewelry. She testified that jewelry was taken from her bedroom as well, including a gold watch, a Rex pin, a monogrammed pin, and matching earrings. She also saw the two men take a combination TV and VCR, a boom box, a stereo, and a small TV. She went downstairs with them to her son's bedroom where they took a couple of Walkmans, a boom box, cameras, a pair of socks, and a sailing trophy that had a barometer in it. The older man asked for her keys, and the juvenile said that he already had them. The two then put the things they took into D.K.'s white Taurus station wagon. D.K. called her son-in-law who came and untied her.
The police received the call from D.K. at about 11:35 p.m., and Officer Reginald Cryer testified that they responded within five minutes of receiving the call. A description of D.K.'s vehicle was broadcast; and shortly after midnight, the car was located at Cambronne and Panola Streets. An officer had seen the vehicle with two men inside it turn the wrong way down a one way street. A chase ensued, and the vehicle crashed into another car and the porch of a home. One of the two men in the car was later found under a house. This man was Earl Patterson, and he said that the other person in the car with him was Bryan Morgan. D.K. was taken to the scene for a possible identification; but when she was shown Patterson, who stood in the headlights of the police car in which D.K. was sitting, she stated that he was neither one of the intruders. D.K. was later shown a photographic lineup that contained a picture of Patterson and a separate photographic lineup that contained a picture of Morgan; but, she did not identify either man as her assailant or the juvenile who was with him. She was shown a third lineup, and she chose the defendant's picture.
On June 27, 1993, at approximately 1:45 a.m., officers went to the 8400 block of Freret Street where P.A.[3] told the police *246 that two men had broken into her house and that the older of the two men had raped her. She testified that she had gone to bed around midnight on the sofa in the living room and that she woke up when she felt the living room light come on. She saw a man pointing a gun at her who told her to get up. He took the diamond ring she was wearing, and they went to the kitchen where another male, who P.A. said appeared to be eleven or twelve years old, was looking around. She saw him take a boom box off of the counter and walk into the laundry room where the back door was located. The older man then hit her in the temple with the gun and ordered her to remove her pants and to face the wall. She did as he ordered, and he then raped her. She chose the defendant's picture out of a photographic lineup, and she testified that she had seen the defendant earlier that day by the fence of her home.
The police obtained a search warrant for the home of the defendant's aunt and uncle, Enez and Dawrail Givens.[4] The police seized jewelry, cameras, and a barometer, which D.K. identified as belonging to her and her children. Mrs. Givens testified that the property that the police seized did not belong to her or her husband, and she could not recall who had brought it to her house. D.K. was shown a picture of Dawrail Givens and testified that he was not the man who raped her. It was stipulated that P.A. would testify that Dawrail Givens was not her assailant.
Agent Keith Howland testified as an expert in the testing of DNA, and he stated that the DNA analysis of the semen sample taken D.K. matched the defendant's DNA. As to the sample taken from P.A., Howland stated that the defendant could not be excluded from being a match.

ERRORS PATENT
A review of the record reveals no errors patent.[5]

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, the defendant complains that the trial court erred by depriving him of counsel of his choice, Perman Glenn. He argues that the State manipulated the process to deprive him of his counsel of his choice by having Judge Bigelow continue the trial of a case in which Glenn represented another defendant until the date of defendant's trial. He further argues that the trial court's denial of his motion for a continuance deprived him of his counsel of choice.
The defendant was represented at trial by Clive Stafford Smith, who enrolled as counsel on October 16, 1993, some seven and one-half months before trial. The record does not list Perman Glenn as enrolling as counsel prior to trial, but Smith states in his brief that he secured an agreement from Glenn to take responsibility for half of the trial. At the start of trial, Smith objected to going to trial without Glenn and stated that he did not have the resources to do the case by himself. The prosecutor noted that Glenn had been present for only the hearing on DNA evidence and referred to Glenn as "second chair." As to the trial in Judge Bigelow's section that had been continued, the prosecutor stated that the continuance had been asked for because the State had just received alibi evidence, which the State needed to contradict. The State further noted that the trial in Judge Bigelow's court was to take one day and that the trial would be completed that day. Smith did not dispute the State's assertions, but objected when the trial court refused to *247 grant a continuance. In denying the continuance, the trial court noted that not much beyond picking the jury would take place on that day and that Glenn would be available for trial the following day. The defendant filed a motion for new trial in which he again complained that he had been denied counsel of choice, and Smith pointed out that the other trial that Glenn was handling did not end until the second day of defendant's trial.
In State v. Jones, 97-2593 (La.3/4/98), 707 So.2d 975, the defendant, who was charged with first degree murder, had been represented by indigent defenders when a new attorney enrolled as counsel. This attorney had been retained by the defendant's father, and one of the indigent defenders stayed on as co-counsel. The trial court revoked the appointment of the indigent defender because the defendant had retained counsel. The court later held a hearing to reassess the defendant's indigent status and the removal of the indigent defender; and at this hearing, the trial court declared the defendant to be indigent and removed the retained counsel from the case. The Fifth Circuit denied the defendant's writ application, but the Supreme Court granted writs and reversed the trial court's ruling. The court reiterated its holding from State v. Harper, 381 So.2d 468 (La.1980), that a defendant has the right to counsel of his choice and that an indigent defendant has the right to appointed counsel. The court further stated that an indigent defendant's right to choose his counsel only extends so far as to allow him to retain the attorney of his choice if he can manage to do so. The right was not absolute and could not be manipulated to obstruct the orderly procedure in the courts and thwart the administration of justice. The court found that the defendant had the right to be represented by the counsel retained by his father. The court also stated that an indigent capital defendant had no recognized right to two attorneys and that such an appointment was left to the discretion of the trial court; however, the court noted that its rules provided that a court shall appoint two attorneys to represent an indigent defendant in a capital case. The court stated that this was premised upon one attorney having primary responsibility for the guilt phase and the other the sentencing phase.
We do not find that the defendant was denied his counsel of choice when the trial court refused to grant a continuance so that Glenn could act as co-counsel with Smith in representing the defendant. The defendant does not specify how his defense to the charges against him was adversely affected or prejudiced because Glenn was not there to assist Smith at trial. Moreover, the same considerations in favor of having two defense attorneys in a capital case do not apply in the present case. As noted in Jones, an indigent defendant does not have a recognized right to two attorneys.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, the defendant complains that he was deprived of his right to a fair trial when the State impermissibly struck potential jurors because of their gender. He argues that because the State used its peremptory challenges to strike all but one man from the jury, the trial court was required to allow him to make a prima facie case of intentional discrimination by the State, which the State should have then had to rebut by giving a non-pretextual, gender-neutral reason for the use of its challenges. The defendant further argues that the State's pattern of strikes clearly established a prima facie case of gender discrimination.
In J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the Supreme Court, citing Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), held that the Equal Protection Clause prohibited discrimination *248 in jury selection on the basis of gender. The court stated that as with Batson claims, a party alleging gender discrimination must make a prima facie showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike. The court further stated that when an explanation is required, it need not rise to the level of a "for cause" challenge, that it merely must be based on a juror characteristic other than gender, and that the proffered explanation may not be pretextual.
Whether a challenge is race-based or gender-based, the challenging party bears the initial burden of establishing a prima facie case of the State's discriminatory use of a peremptory strike. State v. Bourque, 96-0842 (La.7/1/97), 699 So.2d 1. The defendant may satisfy this initial burden by offering any relevant facts on the issue, including, but not limited to, a pattern of strikes, statements or actions that support an inference of impermissible motivation, the composition of the jury finally impaneled, and any other facts showing a disparate impact upon the alleged victim class. Id. For a Batson challenge to succeed, it is not enough that a discriminatory result be evidenced; rather that result must be traced to a discriminatory purpose. State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272. The sole focus of the inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes. Id. Disparate impact on a suspect class, while deserving of some weight in determining whether purposeful discrimination exists, is not a dispositive factor since an argument relating to the impact of a classification does not alone show its purpose. Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).
Although a full transcript of the voir dire is not in the record, but it does contain the defendant's objections to the State's striking several men from the jury. The State cut one man and one woman in the first group of jurors by using backstrikes; and, the defendant made his first objection after the State struck two men in the second group of jurors. The defendant noted that the jury at that point consisted of six women and no men. The trial court stated that the Batson challenge was denied. The defendant objected again when the State cut another man, and the trial court again denied the Batson challenge. The State accepted one man, Bundy, but struck another man to which the defendant renewed his Batson objection. The trial court again denied the challenge. Another man, Jones, was accepted by both the State and defense; and, the defendant then used a backstrike to remove Bundy. The State, in turn, used a backstrike to remove Jones; and, again, the trial court denied the defendant's Batson challenge. The jury was completed after the third group, and the jury was composed of one man and eleven women. One of the two alternate jurors was also a man. The State was never required to provide reasons for any of the peremptory strikes it exercised.
The defendant asserts that the State's pattern of strikes established a prima facie case under Batson and argues that the trial court should have required the State to give gender-neutral reasons for the six men it struck from the jury. The defendant further asserts that the State pretended to accept male jurors and would then backstrike them after the defense accepted them in an effort to make the pattern of its gender-based strikes less obvious.
In denying the defendant's Batson challenges, the trial court must have concluded that the defendant failed to establish a prima facie of gender discrimination by the State in the exercise of its peremptory strikes; hence, the State was not required to give the trial court gender-neutral reasons for the exercise of those strikes. It does not appear that the trial court erred in denying defendant's Batson challenges without requiring the State to provide gender-neutral reasons. Defendant established *249 that the State's exercise of its peremptory challenges resulted in a disparate impact on men, but he did not show that the disparate impact was for the purpose of discriminating against men.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 3
In his third assignment of error, the defendant complains that the trial court erred when it refused to grant a mistrial when a veteran police officer testified about a crime for which the defendant was not on trial. The defendant argues that the prosecutor deliberately elicited the improper remark, thereby entitling him to an automatic mistrial.
A mistrial is warranted under La.C.Cr.P. art. 770 when certain remarks are considered so prejudicial and potentially damaging to a defendant's rights that even a jury admonition cannot provide a cure. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94. Potentially damaging remarks include direct or indirect references to another crime committed or alleged to have been committed by the defendant, unless that evidence is otherwise admissible. La.C.Cr.P. art. 770(2). The comment must be within earshot of the jury and must be made by a judge, district attorney, or other court official. Id. Comments must be viewed in light of the context in which they are made; and, the comment must not arguably point to a prior crime and must unmistakably point to evidence of another crime. State v. Edwards, 97-1797 (La.7/2/99), ___ So.2d ___, 1999 WL 452117. In addition, the imputation must unambiguously point to the defendant; and the defendant bears the burden of proving that a mistrial is warranted. Id. If the elements of Article 770 have not been satisfied, the decision on the motion for mistrial is governed by La.C.Cr.P. art. 771; and, whether a mistrial is warranted under the circumstances is within the sound discretion of the trial judge. Id. A police officer is not considered a court official under Article 770; and, absent a showing of a pattern of unresponsive answers or improper intent by the prosecutor, a mistrial is not warranted. State v. Nicholson, 96-2110 (La. App. 4th Cir. 11/26/97), 703 So.2d 173, writ denied 98-0014 (La.5/1/98); ___ So.2d ___, 1998 WL 234690.
A review of the trial transcript shows that the following transpired when Detective Fred Moore was being questioned by the prosecutor about Earl Patterson, the person who had been a passenger in D.K.'s stolen car:
Q At what point, Officer Moore, did you  did you ever meet Earl Patterson?
A I don'tI don't think I did.
Q Okay. But you were aware at the time that you interviewed [D.K.] on the 23d that he had been arrested the night before?
A That's correct.
Q Was he still arrested on Saturday, the 25th, 26thsorry, 26th, 27th?
A I'm sure he was.
Q Bryan Morgan, did you have occasion to contact or try to track down Bryan Morgan?
A Bryan Morgan was still in custody. I interviewed him at central lockup.
Q Do you remember when that was? Let me ask you this. Was it before Eddie Givens' arrest?
A It was before his arrest.
Q Okay.
A It was before Eddie Givens was even identified.
Q And are you aware of the fact that Mr. Givens was also identified by another rape victim for a rape that occurred on that Saturday night, Sunday morning?
A Yes.
Q At that time, both Mr. Patterson and Mr. Morgan were in jail, is that correct?
A Yes. He was identified in two other rapes, one where
MS. LAGATTUTA:

*250 Your honor, can we approach?
A bench conference ensued, and the defendant moved for a mistrial on the grounds that the officer made an impermissible reference to another crime, namely the rape of another woman a few hours after the attack on P.A. The defendant had been indicted for the rape of the other woman, but the charges stemming from that attack were severed from the charges involved in the present case. The trial court denied the motion for mistrial, and the trial court did not admonish the jury to disregard the remark.
We find that the trial court did not err in not granting an automatic mistrial under Article 770. A reading of the above-quoted passage does not support the defendant's assertion that the prosecutor deliberately elicited the remark about the two other rapes from the officer. She asked the officer if the defendant had been identified by another victim, not victims, for a rape, not rapes. The officer's reference to the defendant's having been identified in two other rapes was not responsive to the prosecutor's question which simply asked whether or not Patterson and Morgan were in jail at the time of the rape of P.A.
Since the defendant was not entitled to a mistrial under Article 770, the applicable article is Article 771, which provides that the trial court can grant a mistrial if an admonition is not sufficient to assure the defendant of a fair trial when a witness makes an irrelevant or immaterial remark or comment of such a nature that it might create prejudice against the defendant in the mind of the jury. The decision to grant a mistrial or to give an admonition is within the sound discretion of the trial court, and the court's ruling on whether to grant a mistrial for a comment by a police officer referring to other crimes evidence should not be disturbed absent an abuse of discretion. State v. Nicholson, 96-2110 at p. 13, 703 So.2d at 180. A mistrial is warranted if substantial prejudice will result which deprives the defendant of a fair trial. State v. Manuel, 94-0087, 94-0088 (La.App. 4th Cir. 11/30/94), 646 So.2d 489.
We find no abuse in the trial court's discretion in denying the defendant's motion for a mistrial under Article 771. The officer's comment was not an unambiguous reference to an inadmissible other crime. The defendant was on trial for two counts of rape, and the comment could have been construed as referring to those two rape counts.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 4
In his fourth assignment of error, the defendant complains that the trial court erred in either not disqualifying the District Attorney's office or in not allowing him to relitigate motions that had been ineffectually presented by prior counsel. The defendant argues that because four of the six student practitioners who had worked on his case when he was represented by the Loyola Law Clinic went to work for the District Attorney's office, the District Attorney's office should have been recused because of its conflict of interest.
La.C.Cr.P. art. 680 provides:
A district attorney shall be recused when he:
(1) Has a personal interest in the cause or grand jury proceeding which is in conflict with fair and impartial administration of justice;
(2) Is related to the party accused or to the party injured, or to the spouse of the party accused or party injured, or to a party who is a focus of a grand jury investigation, to such an extent that it may appreciably influence him in the performance of the duties of his office; or
(3) Has been employed or consulted in the case as attorney for the defendant before his election or appointment.
*251 In a motion to recuse the district attorney, the defendant bears the burden of showing by a preponderance of the evidence that the district attorney has a personal interest that is in conflict with the fair and impartial administration of justice. State v. Bourque, 622 So.2d 198 (La.1993). This standard of proof applies for the disqualification of an assistant district attorney, and the grounds are not necessarily restricted to the statutory grounds to recuse a district attorney set forth in Article 680. Id. In State v. Edwards, 420 So.2d 663 (La.1982), the Supreme Court held that the recusal or disqualification of an assistant district attorney did not require the recusal of the district attorney or his other assistants.
The focus of the defendant's argument for recusal of the entire district attorney's office is the performance of the four assistant prosecutors when they were student practitioners with the Loyola Law Clinic and before they were employed by the district attorney's office. He points to their inexperience, their failing to meet with the defendant, and their intending to go to work for the district attorney's office at the time they represented him to support his argument that a conflict of interest existed. He further asserts that the entire district attorney's office should have been recused in order to avoid the appearance of impropriety especially since one of the former student practitioners, Wynn Eikel, was in the courtroom during the trial. We note that the defendant does not allege that any of the former student practitioners who had represented the defendant prior to joining the district attorney's office actually participated in or otherwise aided the prosecution.
We find that the trial court did not err in denying the motion to recuse the entire district attorney's office under Article 680. The defendant's complaints are really more in the nature of a claim of ineffective assistance of counsel as to the actions, or lack thereof, on the part of the student practitioners prior to their going to work for the district attorney's office. In other words, any conflict of interest arising from their seeking employment with the district attorney's office while they were student practitioners existed before they became assistant district attorneys. Moreover, there is no support in the record to show that these four assistant district attorneys had any part in the prosecution of the present case; and, the mere fact of their employment with the district attorney's office, without more, is not sufficient to meet the defendant's burden of proof on the motion to recuse. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 5
In his fifth assignment of error, the defendant complains that the prosecution should not have been allowed to renege on a plea agreement. He asserts that the prosecutor offered a "plea of 30 years" to which he was agreeable; and that after defense counsel represented Judge Frank Marullo in an election law challenge to Camille Buras, who was using campaign finance money from Harry Connick, the offer was withdrawn. He argues that the actions of the State were unfair and that the original agreement should be enforced.
In his motion to recuse the District Attorney's office filed on March 24, 1997, the defendant stated that prior to the election, Margaret Lagattuta, the prosecutor handling the case, had been attempting to reach a reasonable resolution of the case on a "plea to 35 years imprisonment." He further stated in the motion that Connick illegally contacted the trial judge and told the judge that a settlement of the case would not be countenanced. The defendant argued that under the "outrageous government conduct defense," either the charges should be dismissed or else the District Attorney's office should be disqualified from prosecuting the case. The defendant did not specifically request that the trial court enforce the alleged plea agreement, and there is no other pleading in the record requesting enforcement of *252 the purported plea bargain. The trial court denied the motion after a hearing.
Absent any showing of detrimental reliance prejudicial to the substantial rights of the defendant or evidence of devious practice by the government, such as bad faith negotiation designed to probe the defense psychologically or to gain some other improper advantage, the government remains free to withdraw from a plea agreement up to the time the plea is entered. State v. Caminita, 411 So.2d 13 (La.1982). The real question is whether the defendant has been dealt with in a manner so fundamentally unfair that it shocks the judicial conscience. Id.
There is no evidence in the record showing that a plea bargain was entered into between the defendant and the State or that the State backed out of the bargain as part of a political vendetta against defense counsel. The defendant does not set forth what sort of improper advantage the State tried to gain by way of the plea bargain negotiations. Moreover, the statements in the defendant's trial court memoranda indicate that no final enforceable agreement was ever actually reached. There is no indication that the defendant attempted to enter a guilty plea to the charges against him in an effort to enforce the purported plea bargain.
This assignment is without merit.
For the foregoing reasons, the defendant's convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] The indictment also had three other counts (Counts 7, 8, and 9); but a nolle prosequi was entered as to those counts on June 16, 1997.
[2] Due to the nature of the offense, we will refer to the victim by her initials.
[3] Due to the nature of the offense, we will refer to the victim by her initials.
[4] There names are spelled Inez and Durel in the transcript.
[5] It should be noted that the minute entry for trial states that as to Count 2, the defendant was found guilty of simple burglary; but the trial transcript states that the defendant was found guilty of simple burglary of an inhabited dwelling on Count 2. When there is a conflict between the transcript and the minute entry, the transcript controls. Therefore, the condition that the first year of the sentence on Count 2 be served without benefit of parole, probation, or suspension of sentence is legal. La. R.S. 14:62.2.