763 So.2d 738 (2000)
STATE of Louisiana
v.
Manuel G. HOOKER, et al.
No. 2000-K-0751.
Court of Appeal of Louisiana, Fourth Circuit.
May 17, 2000.
*739 Harry F. Connick, District Attorney Of Orleans Parish, Cate L. Bartholomew, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff.
Harold P. Ducloux, III, Clive A. Stafford Smith, Timothy Meche, New Orleans, LA, Amicus Curiae.
(Court composed of Judge MIRIAM G. WALTZER, Judge DENNIS R. BAGNERIS, Sr., Judge PHILIP C. CIACCIO, Judge Pro Tem.)
WALTZER, Judge.
The prosecution invokes our supervisory jurisdiction concerning the rulings of the trial court in this matter. Since important issues are to be decided involving the prerogatives of the judiciary, it is necessary that we detail all the background in this matter.

STATEMENT OF THE CASE
The following statement of the case is taken from the per curiam in State v. Hooker, 2000-K-0662 c/w 2000-K-0663 (La.App. 4 Cir. 3/27/00), 757 So.2d 904. On April 22, 1999, in case # 406-445, the defendants were each indicted for one count of second degree murder, charges to which they subsequently pled not guilty. Trial was held in November, but apparently either a mistrial was declared or the jury could not agree on a verdict (the docket master does not contain any entry for the second day of trial). The trial was eventually reset for early February, 2000, but the court continued it because of the illness of one of the defense attorneys. The case was then reset to 23 February. The night before trial the State learned that its sole eyewitness to the murder, who apparently was in the company of the defendants at the time of the murder, was incarcerated in St. John Parish on unrelated charges. The State appeared on the day of trial with a motion for continuance. The court offered to choose the jury that day, but not swear them, and then start the testimony the next day after allowing the State time to obtain and meet with the witness. The State declined this offer. The court denied the continuance. The State then nolle prosequied the case. The court ordered the defendants released.
One of the Assistant District Attorneys connected to the case contacted the Orleans Parish Criminal Sheriffs Office, specifically Capt. William Hunter, in an effort to forestall the release of the defendants pending the probable re-indictment of them the next day by the grand jury. Because Capt. Hunter would not hold the defendants based solely upon a telephone call, the Assistant District Attorney then completed a screening sheet which indicated the defendants would be re-indicted and requested that the defendant not be released. This form was presented to Capt. Hunter on 23 February, the day the case was nolle prosequied, and the defendants were not released. The next day the State presented the witness to the grand jury, and the grand jury again returned an indictment against the defendants. The new charges were re-instituted in case # 413-028.
On 13 March defense counsel for Larry Hooker moved to quash the charge and to recuse the District Attorney's Office from the case, alleging prosecutorial misconduct *740 in the manner in which the defendants were held between the time the court ordered their release and the time they were re-indicted. A hearing on these motions was held on 16 March, and on 17 March the court denied the motion to quash but granted the motion to recuse. Also on that date the court found Capt. Hunter and the District Attorney's Office in contempt. The court sentenced Capt. Hunter to serve forty-eight hours in the St. Tammany Parish Jail. The court sentenced the District Attorney's Office to pay $6,000 ($3,000 as to each defendant) and ordered all attorneys in the office to attend a seminar on ethics, professionalism, and court practice, to be set up at the District Attorney's Office expense within ninety days. The court also ordered the defendants released under home incarceration, the cost of which is to be shared by the District Attorney's Office and the Orleans Parish Criminal Sheriffs Office. Capt. Hunter and the State noted their intent to seek writs. Capt. Hunter was granted twenty-four hours to seek relief, and his application was timely filed in this court under case 2000-K-0663. Writ 2000-K-0662, filed by the State, is actually an amicus brief filed by the State on the issue of Capt. Hunter's contempt adjudication and sentence, and therein the State asked for a stay of all orders by the trial court. On 17 March, this court granted the stay, ordered the trial court to file a per curiam by 1:00 p.m. on 21 March, and ordered the State to produce the transcripts of the 16 March and 17 March hearings by 1:00 p.m. on 21 March. In response, the trial court timely filed its per curiam, and the State was granted an extension to file the transcripts. The State ultimately filed the transcripts on 21 March. On 27 March 2000 in writ 2000-K-0662 c/w 0663, this Court granted the writ, vacated the judgment finding Capt. Hunter in contempt and the sentence, and remanded the case for further proceedings.
The State had requested a stay order from the trial court, but the request was denied. On 17 March 2000 this Court granted a stay of all orders. The State was given until 28 March 2000 to file its writ. The State's application was timely filed on 28 March 2000.

FACTUAL TESTIMONY
According to the transcript of 23 February 2000, on that date in case number 406-445 the State filed a motion for a continuance based on the unavailability of its only material witness, Deshean Valentine. The State claimed that it was unsure whether it could obtain Valentine for the trial on 24 February; if it proceeded to select a jury, then there might be some double jeopardy problems. Defense counsel claimed that the State's comments were untrue. The State noted that at the last setting of trial, the State had declared that it was ready to go to trial, but something had happened the day before. The State said that it made every attempt to contact Valentine or his family members. An investigator was put on the case. The State claimed that it could not guarantee that it could produce Valentine the next day for trial.
The trial court noted that the witness was being housed about forty-five or fifty minutes from New Orleans and thought that it was absurd for the State to say that it could not secure his presence when he was in custody that close by. The court offered to FAX a writ to obtain the witness' presence. The court placed of record that the discussion had been ongoing for two hours, the jurors were outside, and the State was acting in a dilatory and "unresponsible" manner. The court denied the continuance. The State declared that it had no objection to proceeding to trial, but did object to the bifurcated proceeding (selecting the jury that day and proceeding to trial on the next day) in the second degree murder trial involving two defendants. The court stated that handling the proceeding in this manner was to accommodate the State. Selecting the jury and hearing the witnesses could begin that day. The State again moved for a continuance *741 based on La. C.Cr.P. art. 61 including factors that came to light between 6:00 p.m. on February 23 and 10:55 a.m. on 24 February .The court denied the motion again. The State then asked for a stay of the proceedings, which was denied. The State then noticed its intent to seek writs. The trial court placed on the record that the trial had been properly set and the court had tried to accommodate the State. The trial court set a return date of 12:30 p.m. on 23 February 2000.[1]
At the 16 March 2000 hearing on the defense motion to quash the indictment reinstituting the charge against the defendants and the motion to recuse the Orleans Parish District Attorney's Office, defense counsel for Larry Hooker argued that the State's motion for a continuance had been denied, and the State sidestepped the court's ruling by entering a nolle prosequi concerning the charge and then re-indicting the defendants on 24 February 2000. The defense claimed that the State never attempted to obtain the presence of the witness, who was in custody only forty-five minutes away, by asking the court for a writ of habeas corpus or by other means. Counsel argued that the Hookers were never released because the State circumvented the trial court's order of release by providing Capt. Hunter with the necessary paperwork.
Capt. Hunter, the Director of Intake Booking and Records, testified that he received the trial court's order of release in the afternoon of 23 February 2000. He said that he received oral and written communications from the State relating to Larry Hooker. The Assistant District Attorney called him and informed the captain that the State was re-instituting the murder charge. Capt. Hunter testified that he told the Assistant District Attorney that he needed some "acceptance paperwork" to hold the defendant. Capt. Hunter thought that he had also spoken to Melanie Tallier[2] at the District Attorney's Office. Prior to receipt of the court's order of release, the captain stated that he received the acceptance documentation on the second degree murder charge (a screening action form). The form indicated that the defendant was not to be released because he was to be re-indicted on 24 February 2000. The form provided in the comments section: "Do Not Release! Defendant to be re-indicted (not clear) by Grand Jury on 2-24-00 For 14:30.1." Capt. Hunter could not explain when or how the new case number (413-028"K") was placed on the paperwork. He said that the case number was not on the document when he received it. He did not recall putting (or having someone else place) those comments into the computer. His paperwork did not indicate the time when the Hookers were re-indicted.
On cross-examination Capt. Hunter stated that it would normally take several hours for a person to actually walk out the door after being released depending on the volume of paperwork on the day and the location of the prisoner. He stated that he received the order of release after 4:00 p.m. on 23 February 2000. He said that he received the screening form shortly after lunch on 23 February 2000. Capt. Hunter stated: "I mean, I've been here many years here [sic], twenty-two years and this has not been a problem previous, I mean, to this case. I mean, I've gotten paperwork on people in similar circumstances and handled it this way. It's never been a problem previously."
*742 The trial court then questioned Capt. Hunter and asked whether he received an order from the court releasing the Hookers; he answered affirmatively. The court then asked whether the captain had had previous conversations with the court to the effect that a telephone call from anyone could not override a court's order. The witness attempted to interject that his reason for asking for paperwork stemmed from those conversations. The captain conceded that he had had "many conversations with this Court." Capt. Hunter declared that he believed that he was obligated to hold a person if he had a screening action form indicating that charges had been accepted. The captain maintained that he did not remember a discussion specifically aimed at screening action forms. He said that the only way to explain the case number on the form was that perhaps it was sent over to indicate the allotment, instead of the charge. Capt. Hunter said that it would have taken four to five hours for the Hookers, who were housed in the old Parish Prison, to have been released.
Counsel for Manuel Hooker stated that he had adopted the pleading of Larry Hooker beforehand and asked Capt. Hunter if Manuel had been released. Capt. Hunter answered negatively, but the captain could not specifically remember Manuel Hooker (and the return on the subpoena did not include paperwork relating to him).
Jacques LeBlanc testified that he was the prosecutor in case number 406-445 charging Larry and Manuel Hooker. Duane Evans was his co-counsel. LeBlanc stated that there was only one eyewitness to the incident, Deshean Valentine. It came to the State's attention about 7:00 p.m. or 8:00 p.m. on 22 February 2000 that Valentine was incarcerated at a juvenile facility in St. John's Parish. LeBlanc said that he moved for a continuance on 23 February 2000 in order that he and cocounsel could re-evaluate their position in the case. He was concerned about selecting a jury especially at the end of the month; he worried that there might be double jeopardy problems. Evans obtained the proper paperwork and LeBlanc went to talk to Valentine on the day of trial; LeBlanc did have a magistrate sign an order to allow him to bring Valentine to New Orleans for the grand jury on 24 February 2000. After speaking to Valentine later that day, LeBlanc felt that he could go forward with the trial.
On cross-examination LeBlanc stated that he did not draft the order and present it to the trial court or make any attempt to ask the court for an order to bring in Valentine. LeBlanc acknowledged that the trial court had offered to issue an order to facilitate the presence of the witness on 23 February 2000 and had offered to pick the jury on 23 February and wait until 24 February to start testimony to accommodate the State. LeBlanc listed his five reasons for the continuance. LeBlanc, who said that he had been an Assistant District Attorney for about one and one-half years, conceded that he had filled out and sent the screening action form to Capt. Hunter prior to Valentine's testimony before the grand jury. He said that he had never nolle prosequied a murder indictment before. LeBlanc testified that he did not know that the trial court issued an order of release because he was not in the courtroom when the case was nolle prosequied. He knew that "it was probably going to happen." LeBlanc expressed his belief that he had been forced to trial on a murder case and had therefore re-instituted the charge. He acknowledged that under La. C.Cr.P. art. 382 the second degree murder charge had to be brought by grand jury indictment. He noted that his only eyewitness, Valentine, had been charged with possession of stolen cars and simple burglaries of vehicles. He said that he was comfortable with the trial date on 23 February before he knew about Valentine's new arrest on multiple charges. He was then not sure about Valentine and did not think that he would be ready to testify *743 in a murder case on the day that he faced a hearing on his charges in St. John's Parish.
On redirect examination LeBlanc stated that while he was working on the screening action form, he was also trying to find out Valentine's exact location. He said that Weilbacher had sent him to Melanie Tallier or Margaret Hay on the second floor of the District Attorney's Office. He was told to complete a screening action form.
Pursuant to the trial court's questions, LeBlanc acknowledged that the trial court had stated that it would allow the State an opportunity to speak to Valentine prior to trial. The court had suggested picking the jury that first day, but not swearing in the jurors because jeopardy would attach at that point. The court noted that it intended to provide the State with the opportunity to speak to Valentine on the evening of 23 February 2000; if there were problems, the court intended to entertain a continuance. LeBlanc claimed that he and the other Assistant District Attorney were not comfortable proceeding with any portion of the trial before they spoke to Valentine. LeBlanc said that his conversation with Captain Hunter that day was the first time he had spoken to the captain. LeBlanc stated his reason for calling Capt. Hunter: "I had to find out what could be done to ensure that these two were not released to the public at large." He explained that he was working to re-institute charges before the defendants could be released. LeBlanc clearly stated that he had not told the captain that the case had been nolle prosequied because he was not sure what had been done. When the court asked whether LeBlanc's paperwork was aimed at preventing Capt. Hunter from honoring the trial court's release order. LeBlanc stated that his intent was not to honor or dishonor the court's order; his intent was to re-institute the charges as quickly as possible. The Assistant District Attorney was confronted with the screening action form on which he wrote "Do not release!" LeBlanc conceded that he meant not to release the defendants. The Hookers were not released. He stated that he did not write the new case number on the form.
On recross-examination LeBlanc testified that he went to his supervisor, David Weilbacher, the Deputy Chief of Trials, because he did not how to proceed. He then went to Melanie Tallier, Deputy Chief of Screening, and Margaret Hay, Homicide Screener (who is in charge of the grand jury). Based on what his supervisors told him, LeBlanc took action. The court then asked a final question relating to whether LeBlanc's notion of how to stop the release was his idea or the mandate of one of the supervisors. He stated: "I believe this all came out as a result of a conversation, or conversations with several people going  ranging from Mr. Evans to Melanie Tallier and anybody that I spoke to during this whole procedure about my concerns about the possibility of this case being null proc'd [sic] and these defendants being released and what could we do  what if anything could we do about that." LeBlanc would not say that it was his idea to block the release; however, he also would not say that anyone else told him to block the release. He continued to say that he did not know until very late that the charge had been nolle prosequied because Evans actually went to court. LeBlanc admitted that he made the copies of the screening action form and delivered them to Capt. Hunter.
Weilbacher then asked if he could take the stand and explain what happened. The trial court declared: "All I know is my order wasn't followed and I got a problem with that. And I've expressed that before. That's one. You can step down. Number two, any and everybody in and everybodies [sic] that are responsible for that I have a problem. And the problem ranges from those who are attempting it for the first time and those who have attempted it and/or accomplished it before." The court went on to say:

*744 No I'm not happy  let's make the record clear. The Court is not not [sic] happy that the Hookers were not released, the Court is not happy than anyone who has a valid order of release, anyone, is not released pursuant to that order. The Court is not happy when it's [sic] orders are not complied with and honored. And the Court is not happy when the judicial process is circumvented.... The Court is not happy when lawyers do not perform and respond professionally and ethically, courteously and responsive [sic].... And the Court, this Court, this Judge, has been on this bench for three years and we have expressed that repeatedly and consistently and this Court is not going to allow it's [sic] orders to be circumvented, thwarted, or ignored.
David Weilbacher then explained:
What the State wants to establish and wants the Court to understand is that it did not  it didn't intend any disrespect towards the Court. What the State wants, and what I want you to understand. Judge, is that we were following the procedures the way we always had been. And that we did not intend any disrespect to you or your orders. That is the way it's been done and that's why we acted the way we did. And these procedures have been in place for quite some time including back when Mr. Sinha was a Homicide Screener and D.A.
Weilbacher stated that the Assistant District Attorneys asked him what to do and he told them to have the screening action form ready; however, he was not sure of the procedure when a grand jury is involved, and therefore he sent them downstairs.
Capt. Hunter then expressed a similar sentiment that his intention was not to disobey the trial court's order. He explained that the Assistant District Attorney called and asked what was necessary to hold the defendants. Capt. Hunter said that he needed a form showing acceptance of charges against a defendant. He stated that there was no bad faith. He had the form showing the acceptance of charges separate from the charges in the case which had been nolle prosequied. The court declared that it had previous conversations with the captain. Capt. Hunter stated that he did not recall a similar scenario, but he did remember numerous discussions with the court. The captain reiterated that there was no bad faith; he had a document stating that a charge of second degree murder had been accepted. The court pointed out that the indictment was to occur the next day; the court considered his actions as constituting bad faith. The court pointed out that Capt. Hunter in the past had quoted codal articles and told the trial court that its orders were not legal. The court explained that its argument had always been that a court's order is "law" until a higher court reviews it. The court stated that second degree murder charges could not be initiated by a screening action form.
David Weilbacher stated that he wanted the court to understand that the way that the State prevents a defendant from being released is to re-institute charges. The Assistant District Attorney was attempting to inform Capt. Hunter that the State was re-instituting charges by going before the grand jury. The trial court questioned the reason for the phone call from LeBlanc to Capt. Hunter.
After defense counsel made their arguments relating to the motion to quash, Larry Hooker's counsel argued that he thought that there was insufficient evidence to hold Weilbacher in contempt. He claimed that a motion for contempt would make little difference to the State. He argued that the only way was to put the State in the position of defending its conduct in front of a higher court. He orally moved to recuse the District Attorney's Office from the case based on the fact that the State had admitted to a policy of violating the law in furtherance of its prosecution of the case.
*745 On 17 March 2000 the trial court stated that there is a problem when the District Attorneys act like police officers, the sheriffs act like judges, and the entities of the criminal justice system do not mutually respect one another. The court focused on the fact that the court issued a release order, and the State and the Sheriffs Office talked about what to do. The court stated that Weilbacher as a supervisor should not use anything that is not in the Code when he is instructing young attorneys. The court concluded that the second screening action sheet with the new case number was produced to circumvent the court's order. The court focused on the fact that the defendants could not have been indicted before 24 February when the grand jury convened, and yet that fact was used to block their release the day before (in spite of the fact that the grand jury might not have returned a true bill the State did not have the authority to reinstitute charges in this case). The court declared that this case was the second time that this had happened. There was another case, Travis Page (spelled phonetically), but no proper motion was filed by the defense in that case. The court declared that the District Attorney's Office needed to go back to school in criminal procedure. The court held the District Attorney's Office in contempt, set out the fines, the mandatory classes, recused the District Attorney's Office from the case, and released the defendants to home incarceration. The court noted that the action of the Sheriffs Office was a repeated and consistent violation of the court's orders. This instance was not the first time. It occurred again and again. The court found the Sheriffs Office in contempt and ordered Capt. Hunter to spend forty-eight hours in jail.
In its per curiam the trial court declared that there was evidence that Captain Hunter and Assistant District Attorney LeBlanc willfully neglected and disobeyed the order of the trial court to release the defendants when there were no pending charges against them. The court stated that there was evidence that A.D.A. LeBlanc contacted Captain Hunter "for the purpose of conspiring each one with the other, to devise and carry out activities through which the defendants would be unlawfully incarcerated against the direct orders of this court and while there were no pending formal charges." The court found that Capt. Hunter had intentionally altered the screening action form. The court focused on the Assistant District Attorney's actions in planning to hold the Hookers after the charges had been dismissed and the court had ordered them released. The court pointed to the State's screening action form, which indicated that the defendants were going to be re-indicted on 2/24/00 and declared: "Do Not Release!" The court noted that its order of release was ignored because of that document. The court noted that the case number, 413-028 was written at the top of the form at some point (perhaps after the fact to cover-up the illegality). The trial court stated:
Liberty was taken with two individuals' liberty with the offered explanation that re-indictment was imminent.... But I know of no provision that allows any of us to delay the safeguards and protected rights of the Constitution, the Bill of Rights, the Code of Criminal Law or the Code of Criminal Procedure. I know of nor accept [sic] any explanation for not requiring a law enforcement officer such as Captain Hunter, or the District Attorney's Office to delay, impede or subvert the law; not even for a few hours. ...
If the supervisors at the District Attorney's Office do not know criminal law and procedure, than [sic] they will continue to misguide, intentionally and/or unknowingly, the younger assistants. Not only will misconduct and miscarriages of justice persist, as has occurred in this case [sic]. Telephone calls in place of writs and appeals. Why didn't *746 they take a legal course of action  like an emergency writ and/or stay. [sic] Dreadful, but maybe they believe a directive from the Sheriff and/or a screening action form supercedes a court order.
* * *
The State dismissed the charges, NP the case, and then asked Captain Hunter to hold the Hookers. They were both wrong. These nefarious actions are appalling and inexcusable, to say the least, and demonstrates [sic] the willingness of both the District Attorney's and the Criminal Sheriffs offices to cross the lines of lawlessness and deception for the sake of keeping the accused, unadjudicated individuals in jail indefinitely.

DISCUSSION
The State filed this application seeking review of the trial court's decision finding the District Attorney's Office in contempt of court, fining it $6,000.00, ordering it to participate in and pay for criminal procedure classes, recusing it from the case, ordering home incarceration for the two defendants at the expense of the State and the Criminal Sheriffs Office, and finding Captain Hunter in contempt and sentencing him to forty-eight hours in jail.[3] The State argues that the trial court erred when it held the state in contempt of court for failing to comply with the court's 23 February 2000 order because it did not obstruct or interfere with the orderly administration of justice and its actions of accepting a pending prosecution was not willful disobedience. The State contends that the trial court did not find that its actions were willfully disobedient of the court's order of release. The State notes that Manuel Hooker would not have been released; there was a municipal attachment, which would have held him. The State argues that it was not conscious of a duty to obey the release order and the State was within its power to re-institute the charges against the defendants. The State contends that the maximum penalty for constructive contempt is $500.00 under La. C.Cr.P. art. 25(B); therefore, the trial court erred when it fined the State $6,000.00. The State notes that home incarceration is a sentencing alternative that requires that the defendants be probation eligible or convicted of a misdemeanor or felony punishable with or without hard labor; the defendants here had not yet been convicted, and the offense charged (or the lesser included offense) did not fit the criterion. The State argues that payment for the defendants' home incarceration is not listed as the punishment for constructive contempt, which is set out in La. C.Cr.P. art. 25. The State lastly argues that the defendant failed to prove by a preponderance of the evidence that it had a personal interest in the case or other ground under La. C.Cr.P. art. 680 and should be recused from the case. In its application in its argument relating to constructive contempt, the State declares:
Although proper service was not provided in the case at bar, the Office of the District Attorney does not assign as error any procedural irregularities. Although the court failed to properly serve the charged parties, the court conducted a complete hearing on the matter. The court recessed the hearing to the following day, allowing the parties additional time to gather witnesses and to present additional evidence. A complete record of the proceeding has been lodged with this Honorable Court. In the interest of judicial economy, the Office of the District Attorney sees no reason to remand this matter. The Office of the District Attorney submits that the record is sufficient for this Honorable Court's review.
*747 In the amicus curiae brief the Louisiana Association of Criminal Defense Lawyers focuses its attention solely on the issue of whether the trial court had the authority to hold those parties, who intentionally violate the orders of the court, in contempt. The brief argues: "When those charged with enforcing the law are allowed, flagrantly and publically [sic], to break it, the entire fabric of society is threatened. This is particularly true where the illegal actions of `law enforcement' are taken against the individual, as in this case." The amicus brief contends that the trial court exercised its authority appropriately when it found the State in contempt for 1) continuing the case when it had not bothered to prepare; 2) joining forces with the Criminal Sheriff's Office to detain the Hookers illegally; 3) knowingly and intentionally countermanding the trial court's order to release the Hookers; and 4) violating La. R.S. 14:46 by falsely imprisoning the Hookers without proper legal authority.
The amicus brief argues that the 16 and 17 March 2000 transcript reveals a conspiracy between the District Attorney's Office (including high ranking officials there) and the Sheriffs Office to deliberately and purposefully undermine the trial court's order to release the Hookers. The brief contends that the State's actions established the willful disobedience of the trial court's order to release the Hookers. The amicus brief points out that the principal function of the Criminal Sheriffs Office is to run the jail and act as the executive arm of the Criminal District Court; it is not to investigate crime. Citing In re State ex rel. Darden (entitled Proceedings on Behalf of Judge v. Grosch), 222 La. 937, 64 So.2d 225 (La.1953), it contends that the Sheriff's Office had no right to decide whether the order to release was even within the court's authority; it should have obeyed the order. The brief points to the fact that the State and the Sheriffs Office knew that the trial court's order of release was valid; they conspired to countermand that order until the second grand jury indictment by producing the illegal "acceptance form." The amicus brief expresses no opinion on the appropriateness of the sanctions imposed by the trial court or the procedure; however, it argues that if this Court "had qualms in that regard, however, the appropriate remedy would not be to approve the illegal actions of the Office of the District Attorney, but to order that sanctions be properly imposed."

RECUSAL
In the motion to recuse the defense argued that the District Attorney's Office "engaged in contemptuous and criminal wrongdoing," set out to countermand a direct order by the trial court to release Larry Hooker, and intentionally violated La. R.S. 14:46 (false imprisonment). The motion argued that the District Attorney's Office had become a "law breaker" and could not fulfill its duties as an impartial prosecutor. The defense alleged that the District Attorney's Office had violated La. C.Cr.P. arts. 61 and 691 by dismissing the indictment when its motion to continue was denied; that was a continuing and systematic abuse. The District attorney's Office then re-instituted the charges. The motion also listed two violations involving the first trial: the State had asserted that a statement by Larry Hooker would not be used, but then elicited testimony relating to the statement; and the homicide detective gave false and misleading testimony at the first trial, but the State did not inform the defense or the trial court.
La. C.Cr.P. art. 680 provides for the recusal of the district attorney:
A district attorney shall be recused when he:
(1) Has a personal interest in the cause or grand jury proceeding which is in conflict with fair and impartial administration of justice;
(2) Is related to the party accused or to the party injured, or to the spouse of the accused or party injured, or to a party who is a focus of a grand jury *748 investigation, to such an extent that it may appreciably influence him in the performance of the duties of his office; or
(3) Has been employed or consulted in the case as attorney for the defendant before his election or appointment as district attorney.
The defendant bears the burden of proving by a preponderance of the evidence that the District Attorney's Office has a personal interest in conflict with the fair and impartial administration of justice. State v. Givens, 98-0007 (La.App. 4 Cir. 12/8/99), 750 So.2d 242.
In its application the State persuasively argues that the defense did not carry its burden of proof. The State notes that the granting of the motion to recuse was directly related to the trial court's assessment of punishment after finding the State in contempt. The trial court stated that it granted the motion to recuse the District Attorney's Office "for their misconduct." The defense did not produce evidence of a personal interest in the case by the Assistant District Attorneys involved or the District Attorney's Office. The trial court erred by granting the motion to recuse.

HOME INCARCERATION
The State argues that the trial court erred by ordering the release to home incarceration of the pre-trial defendants. La. C.Cr.P. art. 894.2 provides in pertinent part:
A. Notwithstanding any other provision of law to the contrary, a defendant may be sentenced to home incarceration in lieu of imprisonment under the following conditions:
(1) The defendant is eligible for probation or was convicted of a misdemeanor or a felony punishable with or without hard labor.
(2) In felony cases, the Department of Public Safety and Corrections, through the division of probation and parole, recommends home incarceration of the defendant and specific conditions of that home incarceration, or the district attorney recommends home incarceration, or, after contradictory hearing, the court determines that home incarceration would serve the best interests of justice.
(3) The court determines that home incarceration of the defendant is more suitable than imprisonment or supervised probation without home incarceration.
The State correctly argues that home incarceration is an alternative to imprisonment within the Department of Corrections. The State properly notes that defendants may be sentenced to home incarceration if they are eligible for probation or were convicted of a misdemeanor or a felony punishable with or without hard labor. Clearly Larry and Manuel Hooker, who were at the pre-trial stage of the proceedings and had been charged with second degree murder, were not proper candidates for home incarceration.
The trial court erred by releasing the defendants to home incarceration.

CONTEMPT
The State argues that it complied with the statutory provisions and did not willfully disobey or obstruct an order of the trial court.
According to La. C.Cr.P. art. 20, contempt is "an act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority." Under that article there are two kinds of contempt, direct and constructive. Art. 21 sets forth an illustrative list of behavior which comprises direct contempt; art. 23 sets forth a list of behavior which is constructive contempt. The State's actions fall under constructive contempt. La. C.Cr.P. art. 23 provides in pertinent part:
A constructive contempt of court is any contempt other than a direct one.
*749 A constructive contempt includes, but is not limited to any of the following acts:
(1) Willful neglect or violation of duty by a clerk, sheriff, or other person elected, appointed, or employed to assist the court in the administration of justice;
(2) Willful disobedience of any lawful judgment, order, mandate, writ, or process of court....
Art. 24 sets forth the procedure to be used for punishing a constructive contempt:
A. When a person is charged with committing a constructive contempt, he shall be tried by the judge on a rule to show cause alleging the facts constituting the contempt. The rule may be issued by the court on its own motion or on motion of the district attorney.
B. A certified copy of the motion and of the rule shall be served on the person charged in the manner of a subpoena not less than forty-eight hours prior to the time assigned for trial of the rule.
C. A person charged with committing a constructive contempt of a court of appeal may be found guilty thereof and punished therefor after receiving a notice to show cause, by brief, to be filed not less than forty-eight hours from the date the person receives such notice, why he should not be found guilty of contempt and punished accordingly. Such notice may be sent by certified or registered mail or may be served by the sheriff. The person so charged shall be granted an oral hearing on the charge if he submits a written request to the clerk of the appellate court within forty-eight hours after receiving notice of the charge.
D. If the person charged with contempt is found guilty, the court shall render an order reciting the facts constituting the contempt, adjudging the person charged with the contempt guilty thereof, and specifying the punishment imposed.
The penalties for contempt are set out in La. C.Cr.P. art. 25, which provides:
A. A person may not be adjudged guilty of a contempt of court except for misconduct defined as such, or made punishable as such, expressly by law.
B. Except as otherwise provided in this Article, a court may punish a person adjudged guilty of contempt of court in connection with a criminal proceeding by a fine of not more than five hundred dollars, or by imprisonment for not more than six months, or both.
C. When an attorney is adjudged guilty of a direct contempt of court, the punishment shall be limited to a fine of not more than one hundred dollars, or imprisonment for not more than twenty-four hours, or both; and, for any subsequent direct contempt of the same court by the same offender, a fine of not more than two hundred dollars, or imprisonment for not more than ten days, or both.
D. A justice of the peace may punish a person adjudged guilty of a direct contempt of court by a fine of not more than fifty dollars, or imprisonment in the parish jail for not more than twenty-four hours, or both.
E. When a contempt of court consists of the omission to perform an act which is yet in the power of the person charged with contempt to perform, he may be imprisoned until he performs it, and in such a case this shall be specified in the court's order.
An appellate court reviewing a conviction of criminal contempt under La. C.Cr.P. art. 23(2) must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant willfully disobeyed a lawful order of the court. State in Interest of R.J.S., 493 So.2d 1199 (La.1986); In re Milkovich, 493 So.2d 1186 (La.1986).
*750 Because the State declares in its application that it does not assign as error any procedural irregularities,[4] this Court should not consider the notice and service requirements mandated by La. C.Cr.P. art. 24.
Jacques LeBlanc testified that he called Capt. Hunter in order to ensure that the Hookers were not released. Capt. Hunter and the A.D.A. discussed how to prevent the release of the defendants. Capt. Hunter told LeBlanc that he had to produce a screening action form indicating that the State was re-instituting the charges; the captain needed an "acceptance form." LeBlanc had never nolle prosequied a murder case, and he consulted David Weilbacher, who told him to prepare a screening action form indicating that the charges would be re-instituted, but then sent him on to Melanie Tallier and Margaret Hay because an indictment was involved. LeBlanc was advised by his supervisors, and he produced a screening action form which provided: "Do not release! Defendant to be re-indicted [word is not clear] by Grand Jury on 2-24-00 for 14:30.1." Capt. Hunter stated that he received the form hours before he received the trial court's order of release. Regardless, Capt. Hunter accepted that document with LeBlanc's comments that the re-indictment had not yet occurred as sufficient to obligate him to hold Larry Hooker[5] despite the trial court's order releasing him. It is clear from the testimony that the Assistant District Attorney asked Capt. Hunter for guidance to circumvent the imminent order of release by the trial court, and provided the screening acceptance form that Capt. Hunter said that he needed. LeBlanc's supervisors condoned the process. In fact, David Weilbacher testified that he and the others "were following the procedures the way [they] always had been... That is the way it's been done and that's why [they] acted the way [they] did." In light of the testimony, it would be most difficult to conclude that the trial court erred by finding the District Attorney's Office in contempt.
However, the trial court erred by fining the District Attorney's Office $6,000.00. The maximum fine by statute is $500.00. The penalties for contempt are set out by article, and they do not include ordering legal seminars to be paid for by the party found in constructive contempt or ordering the home incarceration costs of the defendants to be paid by the parties found in contempt of court. The ruling insofar as it sets out the penalties for the State's contempt should be vacated.

CONCLUSION
The trial court's ruling insofar as it granted the defense motion to recuse the District Attorney's Office and released the defendants to home incarceration is hereby reversed. The ruling insofar as it finds the District Attorney's Office in contempt is affirmed. The sentence of the trial court, which included the $6,000 fine, ordering seminars to be paid by the State, and ordering the State and the Sheriffs Office to pay for the defendants' home incarceration, is hereby vacated. and the matter is remanded for resentencing within the statutory limits of La. C.Cr.P. art. 25.
APPLICATION FOR SUPERVISORY WRITS GRANTED. THE TRIAL COURT'S RULING TO RECUSE THE DISTRICT ATTORNEY IS REVERSED. THE TRIAL COURT'S *751 RULING FINDING THE DISTRICT ATTORNEY'S OFFICE IN CONTEMPT IS AFFIRMED. THE CONTEMPT SENTENCE IS ORDERED VACATED. THE MATTER IS REMANDED FOR RESENTENCING.
NOTES
[1] Although the transcript provided to this Court ends at that point, the docket master and minute entry indicate that the charges were nolle prosequied, defense counsel for Larry Hooker requested his clients' release, and asked that the trial court order the State not to place a hold on the defendant pending re-institution of the charges. The court granted the release and stated that it did not recognize telephone holds made by the D.A.'s Office to the Sheriff and did not know the authority for the Sheriff's actions.
[2] The names are spelled phonetically in the transcript.
[3] In writ 2000-K-0662 c/w 0663 this Court vacated the judgment finding Capt. Hunter in contempt and his sentence due to lack of adequate notice. The State's argument relating to Capt. Hunter will not be considered.
[4] The State noted that proper service was not provided, but declared that there had been a complete hearing (and the hearing was recessed to the following day to provide additional time to gather witnesses or to present additional evidence) and there was no reason to remand the matter because the record is sufficient.
[5] The State notes that Manuel Hooker would not have been released because of a municipal attachment. The motion to quash and the motion to recuse were originally filed by Larry Hooker's counsel.