John JOHNSON and Jay Shue *v.* Randy JOHNSON,
Pulaski County Sheriff, and the Honorable
Marion Humphrey, Circuit Judge, Pulaski
County Circuit Court

00-1320 33 S.W.3d 492

Supreme Court of Arkansas
Opinion delivered December 14, 2000

*Mark Pryor*, Att'y Gen., by: *David R. Raupp*, Sr. Ass't Att'y Gen., for petitioners.

*Kaplan, Brewer & Maxey, P.A.*, by: *Philip E. Kaplan* and *Regina Haralson*, for respondents.

R OBERT L. BROWN, Justice. This is an original action involving an Emergency Petition for a Writ of *Habeas Corpus*, or, Alternatively, a Writ of *Certiorari* or Stay of Contempt Order. The petitioners are John Johnson and Jay Shue, who are

deputy prosecuting attorneys for the Sixth Judicial District. The respondents are Randy Johnson, who is Pulaski County Sheriff, and Judge Marion Humphrey, who is circuit judge for the Pulaski County Circuit Court. The petition arises out of the judge's incarceration of the deputy prosecutors for criminal contempt, after they refused to proceed with the jury trial in the case of *State v. Christopher Lee McBride and Nicolus Nigel Smith*. We grant the petition for writ of *certiorari* in part and deny it in part. We further dissolve our temporary stay order.

On July 21, 2000, Christopher McBride and Nicolus Smith were charged with first-degree murder. On August 24, 2000, Judge Humphrey signed two scheduling orders regarding the first-degree murder charges against McBride and Smith. Both orders specified that a two-day jury trial would take place on November 15 and 16, 2000. On the afternoon of Thursday, November 9, 2000, deputy prosecutor Shue filed a motion for continuance on behalf of the State and set out the grounds for the motion:

> The State has ordered transcripts from the bond hearing held in this matter on September 15, 2000. We have not received these and need them for preparation purposes and for use at trial.

On Tuesday, November 14, 2000, Linda Lee, who is the case coordinator for Judge Humphrey, advised the deputy prosecutors that the continuance motion had been denied.

On Wednesday, November 15, 2000, the deputy prosecutors and defense counsel for McBride and Smith met in the courtroom prior to convening formally for the trial. Judge Humphrey inquired as to whether the State was ready for trial and deputy prosecutor Shue answered that the State was not because the State still needed the transcript of the four-hour bond hearing which actually took place on September 19, 2000 — not September 15, 2000. According to Shue, the State needed the specific testimony of Shontae Jackson, who was a key witness for the State in the prosecution of McBride and Smith. According to Shue, Jackson had given "two prior sworn statements" to police detectives but had recanted his statements at the bond hearing and admitted that he had lied to the detectives.

The judge responded that the State knew what Jackson testified to at the bond hearing and that there was no need for a

continuance based on transcription of those statements. Deputy prosecutor Shue replied that the State could not call Jackson as a witness, when it was more than likely that Jackson was going to be arrested for perjury. It would be suborning perjury, according to Shue, to call Jackson as a witness. Shue went on to emphasize that Jackson was an essential witness for the State but that the perjury issue had to be first resolved. Upon the judge's inquiry, Shue asserted that the State needed the transcript of the bond hearing to make a decision on charging Jackson and that he did not know what effect a criminal charge would have on his testimony regarding McBride and Smith.

Shue admitted that Jackson had not been subpoenaed, but defense counsel for McBride volunteered that Jackson was currently waiting in his office. The judge again remarked that he did not believe that a transcript of the September bond hearing was necessary to try the case. Shue stated that he was absolutely surprised by Jackson's testimony at the bond hearing. He further advised the judge, in arguing that no prejudice would occur by a continuance, that the two defendants were out on bond and that there were approximately 187 days left to run under the speedy-trial rule.

Both defense counsel then advised the judge that they were ready for trial. Shue stated that he told Ms. Lee, the case coordinator, that the State was not ready for trial. Ms. Lee stated to the court that she instructed Shue that a continuance would not be granted and that she did not know whether he had subpoenaed his witnesses for trial or not. Shue announced that he was not prepared to go to trial and asked for a hearing on the matter. The court responded: "Well, just because you file a motion [for continuance] doesn't mean the Court's going to grant it."

Deputy prosecutor Johnson reiterated that Shue had told Ms. Lee the State was not ready for trial. Johnson added that this is unavoidable, since the transcript for the bond hearing had not been prepared and since the State needed to know with certainty what Jackson said at that time. Defense counsel for Smith interjected that the audio tape of the bond hearing had always been available to the deputy prosecutors and that they were using the perjury charge as leverage and to "hold that over [Jackson's] head." Shue denied that.

The judge denied the motion for continuance. He explained that a jury trial the previous day had gone until eight o'clock at night so that the McBride/Smith trial could commence and that he was feeling the pressure of the speedy-trial rule on other pending trials based on a list of cases sent over by the prosecutor's office. The judge concluded that the trial would proceed and that Jackson should be brought to the courtroom.

Prospective jurors were then sworn in, the charges were read, and the judge gave the potential jurors initial instructions. *Voir dire* of the jury pool took place and anticipated witnesses were brought in. At that point, the deputy prosecutors asked to approach the bench and in a sidebar conference out of the jury's hearing advised the judge that they had no witnesses. The judge asked if the State was going to *nolle pros* the case, and deputy prosecutor Johnson asked again for a continuance. The judge replied that he had already ruled against a continuance and it was up to the State either to *nolle pros* the case or go forward. The judge added that he was going to submit the matter to the Arkansas Committee on Professional Conduct.

This discussion followed:

> MR. JOHNSON: That's fine, your Honor. But the Court cannot compel us to announce ready when we're not ready.
>
> THE COURT: You have an alternative.
>
> MR. JOHNSON: We're not prepared to nolle pros.
>
> THE COURT: You know you have a year to refile.
>
> MR. JOHNSON: I do, but that subjects these defendants to being rearrested and —
>
> THE COURT: I'm going to order you to get your witnesses over here.
>
> MR. JOHNSON: We haven't subpoenaed the witnesses.
>
> THE COURT: Why not?
>
> MR. JOHNSON: For the reasons we stated previously.
>
> THE COURT: We're going to trial. Do you understand that?
>
> MR. PROCTOR: I move to dismiss, your Honor.

MR. CLOUETTE: I would join in that.

THE COURT: The Court's not going to do that. You get the witnesses over here or be held in contempt of court on your part.

MR. JOHNSON: May I make a record?

THE COURT: No.

MR. JOHNSON: We've not issued any subpoenas. The Court doesn't have the power to order them to appear when there's no subpoenas that exist.

THE COURT: I said for you to get them over here. You know who your witnesses are.

Have I told you that I was not going to go forward with this trial today?

MR. JOHNSON: No, sir, you have not.

THE COURT: Is it your understanding that you decide when a case is tried in this court?

MR. JOHNSON: No, sir, that's not my understanding. My understanding is —

THE COURT: Why didn't you have the witnesses here?

MR. JOHNSON: It's my understanding — first of all, your Honor, we tried to — we did move —

THE COURT: I'm not saying that. I'm not saying that. Why don't you have your witnesses here and you know this case was set for trial?

MR. JOHNSON: Because we're not ready to go forward today.

THE COURT: Then if you're not ready to go forward on the trial, why aren't you nolle prossing the case:

MR. JOHNSON: Because we have a year in which to take a case to trial. It's only been six months.

THE COURT: That's not your decision to make, how we do the docket in here.

MR. JOHNSON: I suppose the Court has other remedies; but I'm not going to move to nolle pros it.

THE COURT: I'm going to call Mr. Jegley [the prosecuting attorney] on this one.

(THEREUPON, in the presence and hearing of the jury, the following proceedings occurred.)

THE COURT: Ladies and gentlemen of the jury, you all may stay here for a moment, we have a problem.

(THEREUPON, court was in recess for approximately five minutes, then the following proceedings occurred.)

THE COURT: Mr. Shue, Mr. Johnson.

(THEREUPON, counsel for the State and Defense approached the Bench, where the following proceedings occurred out of the hearing of the jury.)

THE COURT: Now, for purposes of the record, you're saying that you're not going to call any witnesses?

MR. JOHNSON: Your Honor, for the record, what I'm saying is that we cannot announce ready for trial today.

THE COURT: You're not going to call any witnesses?

MR. SHUE: We can't.

THE COURT: Both of you are in contempt of court. Go with the bailiff.

MR. JOHNSON: May I make a record on that your Honor?

THE COURT: No.

MR. JOHNSON: You're denying me the opportunity to make a record?

THE COURT: Yes.

MR. JOHNSON: You're arresting me and not giving me the opportunity to make a record?

THE COURT: Yes.

MR. JOHNSON: May the record reflect that I asked to make a record on this particular point and I was denied by the Court.

After these events, the judge advised the jury about what had occurred with respect to the continuance motion, its denial, the

lack of the deputy prosecutors' preparation for trial, and the refusal of the State to *nolle pros*. The court concluded by saying: "But there has to be some order established as to who's running this court. And the prosecutor's office is not running the First Division of Pulaski County Circuit Court. And they can be let out when they decide that they're going to subpoena witnesses and get those people here for a trial."

The deputy prosecutors were taken to jail and immediately had the Attorney General's Office file the petition which is before us today. We granted a temporary stay of the circuit court's contempt order by *per curiam* order dated November 16, 2000, and asked for simultaneous briefs on the merits of the petition. On November 20, 2000, the judge entered an order holding Shue and Johnson in criminal contempt pursuant to Ark. Code Ann. § 16-10-108 (Repl. 1999), for failing to go forward with the trial after the jurors had been sworn in and further for refusing to *nolle prosequi* the case.

As posited to us by the deputy prosecutors, the issue for this court to resolve is whether the circuit judge's contempt order should be quashed. First, they claim that their conduct was not contemptuous. Second, they argue that even if their conduct was contemptuous, summary imposition of contempt and the meting out of punishment were not proper, and another judge should determine the matter after notice and an opportunity to defend.

■ We begin by discussing our standards for the issuance of either a writ of *certiorari* or a writ of *habeas corpus*. We have recently said that a writ of *certiorari* is appropriate when it is apparent on the face of the record that there has been a plain, manifest, clear, and gross abuse of discretion by the trial judge and when there is no other remedy. *Arkansas Democrat-Gazette v. Zimmerman*, 341 Ark. 771, 20 S.W.3d 301 (2000); *Arkansas Pub. Defender Comm'n v. Burnett*, 340 Ark. 233, 12 S.W.3d 191 (2000). We have further said that *certiorari* is available in the exercise of our superintending control over a tribunal, when that tribunal is proceeding illegally and where no other mode of review is provided. *Bates v. McNeil*, 318 Ark. 764, 888 S.W.2d 642 (1994).

■ This court has stated that even though a writ of *certiorari* may be requested, we have determined to review ordinary con-

tempt proceedings under the rules and statutes pertaining to appeals and not by *certiorari*. *See Frolic Footwear, Inc. v. State*, 284 Ark. 487, 683 S.W.2d 611 (1985). Nevertheless, in *Bates v. McNeil, supra*, we distinguished *Frolic Footwear* and stated that the remedy of an appeal was useless when contemnors had to remain in jail pending a show-cause hearing. In that case, we held that *certiorari* was the proper remedy. The same is true in the instant case. The remedy of direct appeal would be useless to the deputy prosecutors. Without this court's temporary stay, they might still be incarcerated. As in *Bates v. McNeil, supra*, we hold that here *certiorari* is the proper remedy.

 A writ of *habeas corpus* is granted for a person "detained without lawful authority" or "imprisoned when by law he is entitled to bail." Ark. Code Ann. § 16-112-103(a) (1987). We have held that a person detained without lawful authority occurs when the commitment order is invalid on its face or the circuit court lacked jurisdiction to enter the order. *Sawyer v. State*, 327 Ark. 421, 938 S.W.2d 843 (1997) *(per curiam)*, *Mitchell v. State, ex rel Henslee*, 233 Ark. 578, 346 S.W.2d 201 (1961). In the case before us, we cannot say that the circuit judge's contempt order was invalid on its face or that the judge lacked jurisdiction to enter the order.

We turn then to an analysis of whether Judge Humphrey's contempt order constituted a plain, manifest, clear, and gross abuse of discretion and, thus, whether *certiorari* lies. The Arkansas Constitution gives the General Assembly the power to regulate by law punishment for contempt "not committed in the presence or hearing of the courts, or in disobedience of process. Ark. Const. art. 7, § 26. Accordingly, our criminal contempt law is first found in our statutes, which read in part:

16-10-108. *Contempt.*

(a) Every court of record shall have power to punish, as for criminal contempt, persons guilty of the following. acts, and no others:

....

(3) Willful disobedience of any process or order lawfully issued or made by it[.]

....

(b)(1) Punishments for contempt may be by fine or imprisonment in the jail of the county where the court may be sitting, or both, in the discretion of the court. However, the fines shall in no case exceed the sum of fifty dollars ($50.00) nor the imprisonment ten (10) days.

....

(c) Contempts committed in the immediate view and presence of the court may be punished summarily. In other cases, the party charged shall be notified of the accusation and shall have a reasonable time to make his defense.

Ark. Code Ann. § 16-10-108 (Repl. 1999).

 Where a person is held in contempt for failure or refusal to abide by a judge's order, the reviewing court does not look behind the order to determine whether it is valid. *McCullough v. State*, 339 Ark. 288, 5 S.W.3d 38 (1999); *Etoch v. State*, 332 Ark. 83, 964 S.W.2d 798 (1998); *Carle v. Burnett*, 311 Ark. 477, 845 S.W.2d 7 (1993). The fact that a decree or order is erroneous does not excuse disobedience on the part of those who were bound by its terms until reversed. *Carle*, 311 Ark. at 480, 845 S.W.2d at 9 (*quoting Meeks v. State*, 80 Ark. 579, 98 S.W. 378 (1906)). However, if the contemnor was making a legitimate and successful challenge to the validity of the order, we may look beneath the order and recognize substantive error as a defense to contempt. *Id.* On the other hand, if the contemnor merely refused to comply with an order that was clearly within the judge's jurisdiction and power, we will not look behind that order. *Carle*, 311 Ark. at 481-82, 845 S.W.2d at 10. This court has stated that an act is contemptuous if it interferes with a court's business or proceeding, or reflects upon the court's integrity. *Hodges v. Gray*, 321 Ark. 7, 901 S.W.2d 1 (1995).

 Contempt is divided into criminal contempt and civil contempt. The purpose of criminal contempt is to preserve power, vindicate the dignity of the court, and punish for disobedience of the court's order. *Fitzhugh v. State*, 296 Ark. 137, 752 S.W.2d 275 (1988). Civil contempt is instituted to preserve and enforce the rights of private parties to suits and to compel obedience to orders and decrees made for the benefit of those parties. *Id.* at 139, 752 S.W.2d at 276; *see also Hicks v. Feiock*, 485 U.S. 624 (1988). This court has said: "The substantive difference between civil and crimi-

nal contempt often becomes blurred." *Fitzhugh*, 296 Ark. at 139, 752 S.W.2d at 276.

■■ A judge's power to punish for criminal contempt is not limited by § 16-10-108. The power to punish for contempt is inherent in the courts, and it goes beyond the power given to judges by statute. *Carle*, 311 Ark. at 483, 845 S.W.2d at 11; *see also Hodges*, 321 Ark. at 11, 901 S.W.2d at 3; *Edwards v. Jameson*, 284 Ark. 60, 679 S.W.2d 195 (1984) (court held that inherent power to punish for contempt resides in all courts, includes the right to inflict reasonable and appropriate punishment, and cannot be removed by enactment of laws to the contrary). Moreover, this court has specifically interpreted § 16-10-108(a)(3) (willful disobedience of a judge's order) as not being a limitation on the inherent power of the court to impose a punishment for disobedience of the court's process or order in excess of the statutory provisions. *See Yarbrough v. Yarbrough*, 295 Ark. 211, 748 S.W.2d 123 (1988). Further, before a person may be held in contempt for violating a judge's order, the order alleged to be violated must be definite in its terms as to duties imposed, and the command must be express rather than implied. *Hodges*, 321 Ark. at 17, 901 S.W.2d at 6; *see also McCullough v. Lessenberry*, 300 Ark. 426, 780 S.W.2d 9 (1989) (court reversed contempt finding that the trial court did not issue any orders in definite terms as to the duties imposed upon alleged contemnor). When a party does all that is expressly required of him, it is error to hold him in contempt. *Hodges v. Gray, supra.*

The deputy prosecutors raise several points in support of their position that the judge's contempt order must be quashed:

- They contend that the circumstances of this case did not warrant contempt in order to preserve the dignity of the court or to punish disobedience. The need to exercise the contempt power was not plain and unavoidable.

- It was impossible for them to comply with the judge's order to proceed with the trial.

- The judge's contempt order amounts to punishment for seeking a continuance.

- The judge was not explicit as to what order the deputy prosecutors had violated.

- The judge was without the authority to order them to *nolle pros* the first-degree murder charges.

- Another judge should decide the contempt matter after a show-cause notice and opportunity to defend.

We view the essential question before us as whether Judge Humphrey acted within the bounds of his discretion in holding the deputy prosecutors in contempt for not being ready for trial on the ordered date. A case, albeit a civil one, that bears much similarity to the case at hand is *Carle v. Burnett, supra*. In *Carle*, the attorney who became the contemnor represented the husband in a divorce action. The husband had also been charged criminally for beating his wife. As a result, a civil and a criminal action involving the husband were both proceeding at the same time. The attorney moved for a continuance of the divorce trial three times on multiple grounds, including the ground that a key witness was not available. The third motion was made three days before trial. All continuance motions were denied. On the date of the divorce trial, the husband's attorney refused to proceed with the trial and moved to withdraw as counsel. The sitting judge cited the attorney for contempt, and because a motion for his recusal was pending, he recused. A second judge was appointed to hear the contempt matter, and after a hearing, he sentenced the attorney to ninety days in jail for criminal contempt. The case was appealed to this court, and we affirmed the contempt finding because it was based on the attorney's failure to comply with a court order to go to trial. We noted that this was contempt in front of the judge and that the judge could punish the attorney under his inherent power and not be bound by the penalty limitations of § 16-10-108(b)(1). Though we held that the contempt citation was valid, we also held that the punishment of ninety days was unduly harsh, and we modified the penalty to five days and a fine of $500.

 In the case before us, trial had been set since August 14, 2000, which was almost three months before the trial date, and no continuance had been granted. Despite this, the prosecutors appeared on the day of trial unprepared and without any witnesses. This conduct appears to this court to be in direct violation of the judge's scheduling orders. Surely, the mere filing of a motion for a continuance does not mean that the prosecutors are absolved from all trial preparation. *See Florence v. Taylor*, 325 Ark. 445, 928 S.W.2d

330 (1996) (mere filing of a motion does not continue a jury trial). By a rule of criminal procedure, this court has emphasized that control of the trial calendar is a matter that rests solely with the trial judge who shall provide for the scheduling of cases upon the calendar. Ark. R. Crim. P. 27.2. The scheduling of cases, we have said, is tantamount to a direct order of the court. *Rischer v. State*, 307 Ark. 429, 821 S.W.2d 25 (1991). Moreover, we have said that the trial judges of this state have an obligation to assure that their courts are conducted in an orderly and correct manner. *See, e.g., Florence v. Taylor, supra.*

 The prosecutors correctly argue that a circuit judge cannot order a prosecutor to *nolle pros* a case. That authority resides solely within the bailiwick of the prosecutor. *See Hammers v. State*, 261 Ark. 585, 550 S.W.2d 432 (1977) (neither trial court nor appellate court may compel a *nolle prosequi*). But that fact does not minimize the essential point that the deputy prosecutors violated the court's order in that they were not ready for trial on the appointed day. Nor can we give credence to the prosecutors' argument that they were not explicitly aware of what court order they were violating by not being ready for trial. They knew that trial was scheduled for November 15 and 16, 2000, and that a continuance had not been granted. They also had known about the bond hearing and Shontae Jackson's recanting of his testimony for almost two months. Yet, they had not made a decision on whether to charge him with perjury, though they had had ample time to do so. The judge, under these circumstances, could certainly view the prosecutors' conduct as direct interference with the court's business and as willful disobedience of a court order.

 The fact that the contemnors in this case were prosecutors and not defense counsel or attorneys in a civil proceeding affords no protection. Prosecuting attorneys are clearly subject to contempt citations to the same extent as other attorneys. *See, e.g., State v. Hooker*, 763 So.2d 738 (La. Ct. App. 2000) (held district attorney in contempt of court for not releasing defendants; remanded for consideration of lower fine); *State v. Casey*, 2000 W.L. 166112 (La.), *cert denied*, 121 S. Ct. 104 (Oct. 2, 2000) (assistant district attorney held in contempt for willfully disobeying court order to timely file Sentence Review Memorandum; $250 fine affirmed); *In Re McGinty*, 30 Ohio App. 3d 219, 507 N.E.2d 441 (1986) (assistant county prosecutor deliberately interfered in private

conversation between defense counsel and client and attempted to intimidate defense counsel, all in judge's presence; fine of $100 affirmed); *People v. Endress*, 245 N.E.2d 26 (Ill. App. 1969) (state's attorney held in contempt and fined $100 for failure to comply with pretrial discovery order; order confirmed unless state's attorney complies).

It is true that in the instant case had the prosecutors called their first witness and otherwise been unprepared and lost the case that double jeopardy would have attached and retrial would have been precluded. *See Tipton v. State*, 331 Ark. 28, 959 S.W.2d 39 (1998). It is also true that defense counsel moved to dismiss the criminal charges and the circuit judge could have done that but refused to do so. But neither of those circumstances militates against a trial judge's authority to hold a prosecutor in contempt for not being ready for trial.

Under facts similar to the case at hand, the Colorado Supreme Court affirmed a criminal contempt order against an assistant district attorney who refused to proceed with trial after the trial judge ruled against him on an evidentiary matter. *Turner v. District court*, 188 Colo. 146, 533 P.2d 498 (1975) (en banc). In *Turner*, the trial judge suppressed the defendant's incriminating statement to a police officer on the day of, but before, commencement of a jury trial. The assistant district attorney asked for a continuance of the trial for an interlocutory appeal, and this was denied. The trial judge began *voir dire* of the jury panel. The assistant district attorney advised the trial judge that the judge did not have the power to deny his motion for continuance, and the district attorney refused to proceed with the trial. The trial judge then held the assistant district attorney and his trial assistant in contempt, fined them, and dismissed the case. In affirming the trial court, the Colorado Supreme Court said:

> The jury had been empaneled and had been interrogated by the court at the time the district attorney refused to proceed. The trial judge had to determine whether he would surrender his control over the proceedings and allow the district attorney to determine the trial procedures which were going to be followed in this case. The district attorney did not seek to dismiss his case against Montoya, but sought to test the court's authority to control the course of the trial. The acts complained of occurred in the presence of the court and effectively stopped the trial of the case. This contemptuous conduct of the district attorneys cannot be

condoned. *Pittman v. District Court*, 149 Colo. 380, 369 P.2d 85 (1962).

533 P.2d at 500-01.

■ In the case at hand, the deputy prosecutors also did not *nolle pros* the case because of their lack of preparation and failure to subpoena witnesses but sought to test the court's authority to control the course of proceedings. This, in the words of the Colorado Supreme Court, cannot be condoned. We deny the petition for writ of *certiorari* on the issue of whether a citation for contempt was appropriate in this case.

The State in its brief directed our attention to two contempt cases involving attorneys who sought continuances, but they are not on point. *See Atkinson v. Lofton*, 311 Ark. 56, 842 S.W.2d 425 (1992); *Clark v. State*, 291 Ark. 405, 725 S.W.2d 550 (1987). In *Atkinson*, there was no evidence in the record that defense counsel would have refused to proceed to trial had his continuance motion been denied. In *Clark*, we reversed a contempt order where the trial judge held a lawyer in contempt for filing a motion for the judge to recuse. The *Clark* fact situation does not approximate the facts of the instant case.

■ The next question is whether Judge Humphrey properly exercised his authority in assessing punishment against the deputy prosecutors. The deputy prosecutors urge that the judge should have recused and that, in any event, they were entitled to notice and an opportunity to be heard. We disagree. The prosecutors filed no motion for Judge Humphrey to recuse. In addition, they argued their position in favor of a continuance and against proceeding to trial fully and comprehensively before the judge. The issue was one of proceeding to trial which the prosecutors refused to do in direct contravention of the trial judge's scheduling order. This occurred in front of the judge and under our statutes and under the judge's inherent authority punishment could summarily be meted out. *See* Ark. Code Ann. § 16-10-108(c) (Repl. 1999); *Carle v. Burnett, supra.*

■ We do question, nonetheless, the severity of the punishment. Judge Humphrey provided for no limit on the jail time to be

served.[1] Clearly, unlimited jail time is unduly harsh and constitutes an unreasonable punishment. We modify the contempt punishment to time already served in jail, and we assess a $100 fine against each deputy prosecutor. *See Carle v. Burnett, supra.*

 There are two remaining points that must be addressed. After citing the deputy prosecutors for contempt, the judge told the jury that the prosecutors could be let out when they decide to subpoena witnesses for trial. That suggests remedial or civil contempt. But the judge had already declared a mistrial, of course, and there was no way the matter would be tried on November 15 and 16, 2000. Also, the docket sheet prepared for the deputy prosecutors on November 15, 2000, reflects criminal contempt, and in his November 20, 2000 order, the judge referred to the contempt as criminal contempt. We have already alluded to the fact that often the two contempts blur. *See Fitzhugh v. State, supra.* We conclude that the judge's entered order controls and that the contempt was criminal contempt. We do not consider as pivotal the fact that the judge described the deputy prosecutors' incarceration in his explanation to the jury as more in the nature of civil contempt. What is pivotal is that the deputy prosecutors disobeyed a court order scheduling the matter for trial, and their punishment, therefore, was appropriate.

We would be remiss if we did not comment on the judge's handling of the contempt matter. It would have been eminently preferable for the judge to have declared a mistrial, dismissed the jury, and then assessed a specific punishment against the deputy prosecutors for criminal contempt. In the heat of the moment, this was not done.

The dissent argues that the deputy prosecutors' conduct was not contemptuous, but that is not the case. As already related, their refusal to proceed with trial on the ordered date most certainly interfered with the business or proceeding in the judge's court. *See Hodges v. Gray, supra.* Moreover, it was willful disobedience of the judge's order. *Fitzhugh v. State, supra.* There were ways the deputy prosecutors could have resolved the perjury question relating to

---

[1] In his November 20, 2000 order, the trial judge did allude to a hearing to be held on November 16, 2000, on the contempt matter, but that hearing did not take place due to this court's temporary stay of the judge's order that the deputy prosecutors be incarcerated.

Shontae Jackson, and they simply were not pursued. Were we to countenance the deputy prosecutors' actions in this case, control of trial settings and the management of a judge's docket would be transferred from the court to the litigants. That cannot be. A contempt sanction is the authority available to a trial judge for maintaining order and respect within the courtroom. *Carle v. Burnett, supra.* Furthermore, this is not a case where the judge cited the deputy prosecutors for contempt for filing a continuance motion, as the dissent would have it, but a case where they were cited for refusal to proceed to trial. Refusal to proceed to trial was not the issue in the case cited by the dissent. *See Jolly v. Jolly*, 290 Ark. 352, 719 S.W.2d 430 (1986).

The dissent also claims that the deputy prosecutors' due process rights were violated in that they were denied the right to be heard. However, the deputy prosecutors amply voiced their reasons for not being ready for trial, as previously set out in this opinion, and made their position fully known to the trial judge. The judge, nevertheless, disagreed and found their conduct to be contemptuous. He punished them summarily, which he had every right to do. *See* Ark. Code Ann. § 16-10-108(c); *Hodges v. Gray, supra.*

### Conclusion

We deny the petition for writ of *certiorari* with regard to the contempt citation, but grant it with regard to the punishment and modify the punishment to jail time already served and a fine of $100 to be assessed against each deputy prosecutor. A copy of this opinion will be sent to the Arkansas Professional Conduct Committee.

ARNOLD, C.J., and GLAZE, J., dissent.

TOM GLAZE, Justice, dissenting. The majority opinion concludes that deputy prosecutors, John Johnson and Jay Shue, were guilty of criminal contempt. Nowhere in the record is it revealed that they impugned the trial court's dignity or that court's dignity needed vindicating. What the record does show is that the learned trial judge lost his judicial temperament, and should have voluntarily recused, so another judge could impartially decide the criminal contempt issue. The record is punctuated with the judge's impatience and short fuse in the proceeding below.

The judge's obvious frustration grew from the State's filing a motion of continuance five days before the trial date, November 15, 2000. At a pretrial hearing on November 15, the judge asked the deputy prosecutors why they were not ready for trial. The prosecutors respectfully tried to explain. Mr. Shue reminded the judge that, at a September 19, 2000, bond hearing, they had learned one of the State's essential witnesses, Shontae Jackson, had given a sworn statement which conflicted with two statements he had previously given the police. The prior statements implicated defendants Christopher Lee McBride and Nicolus N. Smith in a murder, but his bond-hearing testimony apparently recanted his earlier statements.

On the same day of the bond hearing, Mr. Shue asked the judge's court reporter for a certified transcription of the four-hour hearing and was told she could not have the transcript ready until January of 2001 — after the date set for McBride's and Smith's murder trial. Shue and one of the defense attorneys, Willard Proctor, presented this transcript delay problem to the judge, who stated, "We'd take [it] up at the appropriate time." Thus, at this stage of the criminal proceeding, the trial court's court reporter was on record as not being able to transcribe the four-hour bond hearing in time for a trial which was to take place in about two months, and the trial court had refused to discuss or resolve the State's problem until the "appropriate time." Defense counsel readily knew that the State was trying to obtain Jackson's transcribed testimony, and he stated he understood the problem and would not object to the State's request for continuance. The foregoing facts reveal the trial court, its personnel, and defense counsel knew of the prosecutors' plight, and the judge could have resolved this problem well in advance of trial.

In addition, the prosecutors had some real legal issues lurking if they had not attempted to obtain Jackson's transcribed, certified statement. One, while the majority suggests the prosecutors could have listened to the tape of the bond-hearing proceeding, the State would need the certified statement for impeachment purposes; if it discovered Jackson had lied, they would also need the statements before filing perjury charges against Jackson. Second, once the State was forced to call its first witness without knowing whether Jackson's testimony would hurt or help its case-in-chief, double jeopardy would attach and the defendants could not be retried even if the State later discovered Jackson agreed to offer false testimony

favoring the defendants. In short, it would have been foolish for the State to proceed in the murder case against the defendants without having Jackson's sworn statement transcribed and certified by the proper court official.

After deputy prosecutors Shue and Johnson offered explanations why they could not proceed to trial and call their first witness, the judge became incensed, disallowing the prosecutors to make a record. The judge's remarks are as follows:

THE COURT: The Court's not going to do that. You get the witnesses over here or be held in contempt of court on your part.

MR. JOHNSON: *May I make a record?*

THE COURT: *No.*

\* \* \*

THE COURT: Now, for the purposes of the record, you're saying that you're not going to call any witnesses?

MR. JOHNSON: Your Honor, for the record, what I'm saying is that we cannot announce ready for trial today.

THE COURT: You're not going to call any witnesses?

MR. SHUE: We can't.

THE COURT: Both of you are in contempt of court. Go with the bailiff.

MR. JOHNSON: *May I make a record on that your Honor?*

THE COURT: *No.*

MR. JOHNSON: *You are denying me the opportunity to make a record?*

THE COURT: *Yes.*

MR. JOHNSON: *You're arresting me and not giving me the opportunity to make a record?*

THE COURT: *Yes.*

MR. JOHNSON: *May the record reflect that I asked to make a record on this particular point and I was denied by the Court.* (Emphasis added.)

The present case is not the first one where a trial judge has shown personal frustration over whether a pretrial motion was either vexatious or filed for purposes of delay. In *Jolly v. Jolly*, 290 Ark. 352, 719 S.W.2d 430 (1986), the court, quoting *Johnson v. State*, 87 Ark. 45, 112 S.W. 143 (1908), stated the following:

> The mere filing and presentation of a motion or repeated motions which are thought to be for the purpose of vexation or delay, do not constitute contempt of court. The court may, in the exercise of its inherent powers, strike them from the files because they are not presented to subserve the ends of justice, and are merely for vexation or delay, but, *unless they are presented in a contemptuous or disrespectful manner, or unless they contain matter which of itself constitutes contempt, the court cannot treat them as contemptuous merely because they are thought to be for vexation or delay.* Take, *for instance, motions for continuance* or change of venue. *The court may well treat repeated motions of this kind as dilatory in their purpose,* and refuse to hear them; *but, if they are presented in a respectful manner, it shows no contempt of court, and cannot be so treated, unless they involve some violation of the court's order, so as to amount to an obstruction of the administration of justice.* (Emphasis added.)

The record fails to show Shue or Johnson filed the State's continuance motion for the purpose of obstructing the administration of justice. In the present case, the deputy prosecutors filed only one motion for continuance, and as can be seen from the record, they were respectful at all times in making their remarks and responses in support of their motion to the judge. Here, the trial judge tried to compel the prosecutors to go to trial or to *nolle pros* the case against the defendants. As the majority opinion recognizes, a judge cannot order a prosecutor to *nolle pros* a case. *Hammers v. State*, 261 Ark. 585, 550 S.W.2d 432 (1977). Nor, it can be said, can a prosecutor "run" a court's docket as the judge expressed and believed was happening in this case. The prosecuting attorney and the trial court each have respective roles and authority to exercise to see that the administration of justice is achieved and a fair trial is obtained by the state and the defendants. The facts and record before this court reflect that, in this particular case, the prosecutors had very good reasons for requesting a continuance, they did it respectfully and timely, giving the judge sufficient time to avoid the cost of summoning a jury. The judge knew two months ahead of trial that his court reporter had problems getting Jackson's testimony so the State could utilize it in preparation for and at trial, but he

chose to delay resolving the matter until the day of trial. As pointed out, one of the defense counsel understood the State's dilemma and, with the slightest bit of cooperation between the prosecutors and the judge, this entire contempt proceeding could have been avoided. While the majority opinion reads that the deputy prosecutors failed to pursue resolving Jackson's possible perjured testimony problem, that simply is not true. As discussed above, they tried to obtain the necessary transcript of Jackson's testimony from the court reporter as soon as they learned that Jackson made such a statement, they unsuccessfully approached the judge for assistance and a ruling on the issue, and they finally requested a timely continuance to permit them the opportunity to resolve the matter. In this latter instance, it was the trial judge's case coordinator, not the judge, who conveyed the prosecutor's motion would be denied without a hearing. In any event, the judge's decision to hold the deputy prosecutors in criminal contempt is erroneous and unsupported by the record.

The foregoing provides reasons alone for granting the deputy prosecutors' petition for writ of certiorari, but it is also important to at least mention how the judge's decision to impose criminal contempt sanctions violates the prosecutors' due process rights. The contempt power "does not provide the trial court with *carte blanche* authority to issue orders of body attachment, detention, and custody, while ignoring portions of statutory provisions relating to contempt proceedings, and without affording procedural protections of due process of law to the parties being placed in arrest and custody." *Bates v. McNeil*, 318 Ark. 764, 768-69, 888 S.W.3d 642, 645 (1994). The United States Supreme Court has also spoken on this subject, holding in *Taylor v. Hayes*, 418 U.S. 488 (1974), that "[e]ven where summary punishment for contempt is imposed during trial, the contemnor has normally been given an opportunity to speak in his own behalf in the nature of a right of allocation." *Taylor*, 418 U.S. at 498 (citing *Groppi v. Leslie*, 404 U.S. 496 (1972)) (internal quotations omitted). Judge Humphrey flatly denied Johnson and Shue the right to make a record and refused to afford them a hearing. The judge also denied the request of deputy prosecutor Tonia Goolsby to stand in for Johnson and Shue, telling her that the two would "have to stand before the court themselves."

In conclusion, then, I believe not only that the actions of Johnson and Shue did not constitute contempt, but also that their

due process rights were neglected in the process. For these reasons, I dissent.

ARNOLD, C.J., joins this dissent.