THE COURT : Where is Ms. Eneks, Mr. Huffman?
MR. HUFFMAN : I don't know, your Honor.
THE COURT : I don't believe you. I believe you told her to leave. Did you tell her to leave?
MR. HUFFMAN : I told her to go get [inaudible].
THE COURT : You told her to leave because you thought she'd be a witness in this case, didn't you?
MR. HUFFMAN : I thought it was possible they would try to.
THE COURT : And anything she might say would probably be contrary to what you're urging me to do, wouldn't it?
MR. HUFFMAN : I didn't want her put on the spot by anybody if she wasn't subpoenaed.
The circuit court then continued the change-of-custody hearing for a later date so that the transcripts from the November 3, 2016 hearing could be obtained. The circuit court also set a show-cause hearing for March 16, 2017, to address whether Huffman and Eneks should be held in contempt for hindering or interfering with the circuit court's proceedings in this case.
At the show-cause hearing, the circuit court entered two court exhibits: (1) the transcript from the March 2, 2017 hearing, and (2) the courthouse security footage from March 2, 2017. The circuit court observed that the footage showed Huffman signaling a "non-verbal cue" to Eneks shortly before the Dowdy hearing, Eneks then leaving the courtroom and driving away from the courthouse, and Eneks returning to the courthouse after Huffman sent her a text message near the end of the Dowdy hearing.
DHS called Ms. Jenson, DHS's area director, as a witness at the show-cause hearing. Jenson testified that it is DHS agency policy for the area director to give the agency's position when the caseworker and the supervisor have differing opinions, that she had reviewed the Dowdy case file before the March 2, 2017 change-of-custody hearing and that she would have been ready to testify as to DHS's position that day had she been called. In response to questions from the court, Jenson testified as follows:
THE COURT : So did I understand you to say that you were here to testify because there was a disagreement in the agency about what the position of the agency was?
MS. JENSON : I think that the workers and supervisors had had some differing opinions over the course of time in this case. And the position of the agency was that this was not an appropriate placement for the children based on his history.
THE COURT : And one of those employees of the agency that might have a different opinion was Ms. Eneks. Isn't that correct?
MS. JENSON : Yes, sir.
Ms. Eneks also testified at the show-cause hearing. Eneks testified that when there is a disagreement between a caseworker and a supervisor, the agency meets and decides who would be the best representative at court. Eneks also testified, "No, I have not recommended anything that contradicted the opinion of the Department in this case. No, I did not at any time recommend or agree that placement should be made with the grandparents." It is unclear whether Eneks was suggesting that she had never held an opinion contrary to DHS's position in this *851 case, or that she simply had not previously submitted this recommendation to the court on behalf of DHS as its designated representative, "recommendation" being a term of art in dependency-neglect and other child-welfare cases in which DHS is typically the moving party.
On cross-examination, Eneks was asked, "Were you under the impression from your supervisor and your attorney that you were to leave the courtroom?" Ms. Eneks's attorney objected to this question, citing attorney-client privilege. The circuit court told Ms. Eneks she could answer if she wanted to, and she elected not to do so.
The show-cause hearing then concluded. From the bench, the circuit court held both Huffman and Eneks in contempt, ruling as follows:
To intensely engage in an activity to deprive the Court of relevant information in any case involving the welfare and best interest of minor children over which this Court has jurisdiction and which the DCFS has responsibility cannot be handled as a chess game. ... Ms. Eneks had been in court all that morning. She was instructed to leave by Mr. Huffman prior to this particular hearing and then immediately returned thereafter because he didn't want someone to put her on the spot. All of this strategy was for the ultimate purpose of having this court reach a less than fully informed decision on the placement of young children. ... There was an overt and conscious act by [Huffman] to deprive the court of relevant material testimony. Ms. Eneks had an opinion either currently or in the past that was opposite to that taken by Mr. Huffman or the department as to placement. To intentionally choose to exclude those relevant facts again deprives this court of relevant information to make the best decision for the children involved.
In its oral ruling, the circuit court made certain statements to the effect that DHS has a "greater responsibility" in child-welfare cases to present all relevant matters to the court, without specific regard to whether any such matter would be consistent with the DHS's stated position in a given case. No such statements are contained in the circuit court's written contempt orders; the written orders turn specifically on the circuit court's finding that Huffman and Eneks each "did intentionally engage in an activity to deprive the Court of relevant information in the above referenced case involving the welfare and best interest of the minor children." As for punishment, the circuit court required both Huffman and Eneks to complete eight hours of community service, to write a one-page treatise on the importance of presenting all relevant facts to the court in child-welfare cases, and to complete an additional hour of ethics CLE.
DHS now appeals to this court, asking us to reverse the circuit court's decision as to both Huffman and Eneks. DHS argues that Eneks was not under subpoena at the March 2, 2017 hearing; therefore, her departure from the courthouse, as well as Huffman's direction that she leave, cannot be considered contemptuous. DHS also argues that the circuit court's decision amounts to an impermissible "local rule" requiring DHS to present all relevant evidence in dependency-neglect proceedings, as opposed to requiring DHS to present only evidence that supports its stated position.
II. The Law of Contempt
On appeal from an order of contempt, this court views the record in the light most favorable to the circuit court's decision, and it will sustain the decision if it is "supported by substantial evidence and reasonable inferences therefrom."
*852 McCullough v. State , 353 Ark. 362, 366-67, 108 S.W.3d 582, 585 (2003). On the subject of contempt, Arkansas law distinguishes between "civil" and "criminal" contempt, and between "direct" and "indirect" contempt.
A. Civil and Criminal Contempt
Contempt is divided into criminal contempt and civil contempt. Johnson v. Johnson , 343 Ark. 186, 197, 33 S.W.3d 492, 499 (2000). Criminal contempt preserves the power of the court, vindicates its dignity, and punishes those who disobey its orders. Id. at 197, 33 S.W.3d at 499. Civil contempt, on the other hand, protects the rights of private parties by compelling compliance with orders of the court made for the benefit of private parties. Id. This court has often noted that the line between civil and criminal contempt may blur at times. Id. "[C]riminal contempt punishes while civil contempt coerces." Ivy v. Keith , 351 Ark. 269, 280, 92 S.W.3d 671, 677 (2002) (quoting Baggett v. State , 15 Ark. App. 113, 116, 690 S.W.2d 362, 364 (1985) (emphasis in original) ).
In determining whether a particular action by a judge constitutes a finding of criminal or civil contempt, the focus is on the character of relief rather than the nature of the proceeding. Fitzhugh v. State , 296 Ark. 137, 138, 752 S.W.2d 275, 276 (1988). Because civil contempt is designed to coerce compliance with the court's order, the civil contemnor may free himself or herself by complying with the order. See id. at 139, 752 S.W.2d at 276. This is the source of the familiar saying that civil contemnors "carry the keys of their prison in their own pockets." Id. at 140, 752 S.W.2d at 277 (quoting Penfield Co. v. S.E.C. , 330 U.S. 585, 67 S.Ct. 918, 91 L.Ed. 1117 (1947) ) (quoting In re Nevitt , 117 F. 448, 461 (8th Cir. 1902) ). Criminal contempt, by contrast, carries an unconditional penalty, and the contempt cannot be purged. Fitzhugh , 296 Ark. at 139, 752 S.W.2d at 276-277.
State law sets out the criminal contempt power of the courts and the appropriate penalties (although, as set forth below, our constitution and caselaw make it clear that judges are not bound by this statute when contempt is committed in the court's presence):
(a) Every court of record shall have power to punish, as for criminal contempt, persons guilty of the following acts and no others:
(1) Disorderly, contemptuous, or insolent behavior committed during the court's sitting, in its immediate view and presence, and directly tending to interrupt its proceedings or to impair the respect due to its authority;
(2) Any breach of the peace, noise, or disturbance directly tending to interrupt its proceedings;
(3) Willful disobedience of any process or order lawfully issued or made by it;
(4) Resistance willfully offered by any person to the lawful order or process of the court; and
(5) The contumacious and unlawful refusal of any person to be sworn as a witness and when so sworn a similar refusal to answer any legal and proper interrogatory.
(b)(1) Punishment for contempt is a Class C misdemeanor.
(2) A court shall always have power to imprison until its adjournment.
(3) When any person is committed to prison for the nonpayment of any such fine, he or she shall be discharged at the expiration of thirty (30) days.
(c) Contempts committed in the immediate view and presence of the court may be punished summarily. In other cases, the party charged shall be notified *853 of the accusation and shall have a reasonable time to make his or her defense.
(d)(1) Whenever any person is committed for a contempt under the provisions of this section, the substance of his or her offense shall be set forth in the order or warrant of commitment.
(2) Nothing in subdivision (d)(1) of this section shall be construed to extend to any proceedings against parties or officers, as for contempt, for the purpose of enforcing any civil right or remedy.
(e) A person punished for contempt under subsections (a)-(d) of this section shall, notwithstanding, be liable to an indictment for the contempt if the contempt is an indictable offense, but the court before which a conviction may be had on such an indictment shall, in forming its sentence, take into consideration the punishment previously inflicted.
Ark. Code Ann. § 16-10-108 (Repl. 2010).
B. Direct and Indirect Contempt
Both the Arkansas Constitution and the governing state statute distinguish between direct and indirect contempt. See Ark. Const. art. 7, § 26 ("The General Assembly shall have power to regulate the punishment of contempts not committed in the presence or hearing of the courts, or in disobedience of process."); Ark. Code Ann. § 16-10-108 ; see also Allison v. DuFresne , 340 Ark. 583, 12 S.W.3d 216 (2000) ; Davis v. Merritt , 252 Ark. 659, 480 S.W.2d 924 (1972). Direct contempt is a contemptuous act "committed within the immediate presence of the Court." Merritt , 252 Ark. at 670, 480 S.W.2d at 930. Indirect contempt is contemptuous behavior committed outside the presence of the judge. An obvious example of direct contempt, apart from open misconduct in the courtroom, is when a party comes to court drunk. See Burradell v. State , 326 Ark. 182, 931 S.W.2d 100 (1996).
A court has inherent power to punish contemptuous behavior committed in its presence, without regard to the restrictions imposed by § 16-10-108(a). Id. at 185, 931 S.W.2d at 102. Summary punishment for contempt committed in the presence of the court is an inherent power reserved to the judiciary and cannot be abridged by legislation. Id. ; see also Hodges v. Gray , 321 Ark. 7, 901 S.W.2d 1 (1995). Furthermore, the appropriateness of a contempt finding does not turn on whether the contemnor subjectively intended to engage in conduct that would be considered contemptuous. Burradell , 326 Ark. at 186, 931 S.W.2d at 103.
III. Analysis
With regard to both Huffman and Eneks, the circuit court's punishment consisted of an unconditional penalty (eight hours of community service and a one-page paper). The law treats this as "criminal" contempt; accordingly, this case requires no assessment of whether Huffman or Eneks has since "purged" his or her contempt. Furthermore, with regard to both Huffman and Eneks, the conduct in question occurred in the presence of the circuit judge. The law treats this as "direct" contempt; accordingly, the circuit court's decision is not subject to the restrictions outlined in Ark. Code Ann. § 16-10-108(a), and the circuit court was within its power to punish the alleged contempt summarily. Burradell, supra. Accordingly, the only question remaining before this court is whether the circuit court's decision was supported by substantial evidence and reasonable inferences therefrom. McCullough, supra.
As to Huffman, the circuit court's decision is supported by substantial evidence and reasonable inferences therefrom. Huffman, an attorney, is an officer of the court, and he owed the court a duty of *854 candor. He knew the subject matter that would be litigated at the change-of-custody hearing, and he knew Eneks's testimony would be highly relevant to that proceeding. It matters not that DHS had designated another individual as its representative for the hearing in question, or that Eneks was not under subpoena that day. There is no requirement that one subpoena an individual to court before one is allowed to call that individual as a witness in a given proceeding, and Eneks had been in court all day testifying in other dependency-neglect proceedings until Huffman directed her to leave. Huffman's equivocal response-"I don't know" -to the circuit court's inquiry as to Eneks's whereabouts, while perhaps not entirely false, was plainly less than forthright and inconsistent with Huffman's duty of candor.
DHS's argument on appeal- that the circuit judge's oral statements from the bench (to the effect that DHS is required to present all material evidence in dependency-neglect proceedings, even evidence inconsistent with its position) constitute an impermissible "local rule" -is unavailing. First, it is not clear from the limited record before this court that DHS raised this argument to the circuit court at any time. Second, the circuit court's written order did not rely on any such proposition, and our decision to affirm the circuit court's written order is not a comment on any such proposition. Third, even if the circuit court had relied on this proposition in its ruling, we would still affirm its decision because its ultimate conclusion is nonetheless correct. See Alexander v. Chapman , 299 Ark. 126, 130, 771 S.W.2d 744, 746-47 (1989) ("We will affirm the trial court's ruling if it is correct for any reason.").
In short, regardless of whether it was problematic that Huffman and DHS declined to present all evidence inconsistent with DHS's position (such as Eneks's testimony), it was certainly problematic that Huffman, undisputedly, took an affirmative step (directing Eneks to leave) to prevent the other parties and the court from presenting or considering such evidence. This action, which occurred directly in front of the circuit judge, was plainly indicative of prior coordination, and the circuit judge reasonably inferred as much. This all tended to disrupt the circuit court's proceedings and to impair the respect due to the circuit court's authority, and the circuit court's decision as to Huffman is affirmed.
We also affirm the circuit court's decision as to Eneks. While Eneks, unlike Huffman, is not an attorney, the circuit court specifically found as follows regarding Eneks's role in the March 2, 2017 hearing:
The Court finds that Ms. Eneks intentionally engaged in the act of leaving the Courtroom and Courthouse so she would not be subject to questioning in (this case). The Court finds, in the present matter, Ms. Eneks had been present in Court all that morning for the entire docket; that she was instructed to leave by Mr. Huffman prior to the hearing and then she immediately returned after because he didn't want her put on the spot about present or previous opinions as to the placement of the juveniles. Ms. Eneks' leaving and returning was of her own volition. She is an experienced employee of the Department and has served as a caseworker and currently is a foster care supervisor.
The circuit court's ultimate conclusion that "there was an overt and conscious act by Ms. Eneks to deprive the Court of relevant and material testimony" is supported by substantial evidence and reasonable inferences therefrom, including the testimony and statements from Eneks, Jenson, and Huffman, as well as the courthouse security footage from the March 2, 2017 hearing.
*855 Without commenting on the propriety of a hypothetical, we note that this is not a situation in which, for example, Eneks had finished all her cases for the day and simply decided to go back to the office to finish other work, or something similarly innocuous. Here, the evidence indicates Eneks knew that DHS's specific aim was to keep her testimony out of the hearing, and Eneks directly advanced this tactic by knowingly and willingly removing herself from the courthouse at Huffman's signal. Eneks's and Huffman's prior coordination toward this end was apparent, and this court simply cannot condone such actions. Accordingly, we affirm the circuit court's decision to hold Eneks in contempt.
Affirmed.
Kemp, C.J., and Womack, J., and Special Justice Grant Fortson dissent.
Wynne, J., not participating.
Courts in Arkansas possess a broad contempt power to facilitate the enforcement of orders, maintenance of dignity, and preservation of authority. While statutes offer guidance in defining offending acts and outlining appropriate punishments, the contempt power is ultimately inherent to the court. It is precisely because of the contempt power's broad scope, however, that this court must take seriously its duty to police whether contempt penalties imposed are "supported by substantial evidence and reasonable inferences therefrom." See, e.g. , Perroni v. State , 358 Ark. 17, 25, 186 S.W.3d 206, 211 (2004). The majority's expansive view of contempt power here, however, opens the door for courts to use that power outside of its traditional role. Instead of maintaining the authority and dignity of the court, the power could be used to micromanage case presentation decisions that have historically been made by the parties and their attorneys. While I support a broad interpretation of the contempt power, I am concerned that this new expansion may lead to abuse. In finding contempt in this case, the circuit court made unreasonable inferences based on thin evidence; this court should reverse. I therefore must respectfully dissent.
At the most basic level, the alleged contemptuous act here is that Tony Huffman, an attorney with the Arkansas Department of Human Services (DHS), and Erica Eneks, a DHS caseworker, "colluded"-to use the loaded language of the circuit court-to have Eneks absent from the courtroom during a hearing in a dependency-neglect case. No one contends that Eneks's presence was required by law or by court order, nor had she been subpoenaed by any party. The majority also concedes that Eneks's presence was not required by court rule (choosing to disregard some ill-founded comments by the circuit court indicating that the court below believed the contrary). No one disputes that Lisa Jenson, DHS's planned witness for the initial hearing, was present and prepared to testify about DHS's ultimate recommendation in the case. It is further undisputed that when asked about Eneks's absence in the initial hearing, Mr. Huffman admitted that he had arranged for Eneks to leave. Stripped to the objective facts available at the end of the initial hearing, then, the circuit court was left with the bare observations that Huffman and Eneks conspired to do something they were allowed to do and then Huffman had the audacity to tell the truth about it. It was on this basis that the circuit court notified Huffman that he and Eneks would be subject to a later contempt hearing. Notably, even at this initial hearing, the circuit court had apparently already decided that "collusive" conduct indicative of "some sort of deceit" had occurred and that it was "obvious that what [Huffman] did was improper."
*856 At the contempt hearing, the circuit court introduced into evidence security-camera footage that did nothing more than corroborate that Huffman had dismissed Eneks from the courtroom for a hearing in which she was not slated to testify. This is, of course, the action to which Huffman had already admitted. The closest any of the testimony at the contempt hearing came to confirming the circuit court's suspicion of ill intent was Jenson's affirmative response to the circuit court's question about whether Eneks "might have had a different opinion" than the agency's ultimate recommendation at some stage in the case. Even this equivocal support was undercut by Eneks's own unequivocal testimony that she had "not recommended anything that contradicted the opinion of the Department in this case."
I am mindful of the fact that circuit courts are better positioned than this court to assess the litigants and facts before them; that is why this court's standards of review on most discretionary issues-applying the rules of contempt among them-are quite deferential. If our review is to have any teeth, however, I cannot conclude that the circuit court's actions in this case were based on substantial evidence or reasonable inferences. For evidence to be substantial, it must "pass beyond suspicion or conjecture." Thompson v. State , 2016 Ark. 383, at 6, 503 S.W.3d 62, 66. The majority concludes that the circuit court satisfied this standard, seemingly crediting the leap of logic expressed by the circuit court at the close of the contempt hearing, that "Ms. Eneks had an opinion either currently or in the past that was opposite to that taken by Mr. Huffman or the department as to placement." Simply put, the evidence supporting that conclusion is thin, Eneks's own testimony contradicts it, and even assuming it were true, there is no law, rule, or norm that would support the idea that criminal contempt is the proper tool with which circuit courts should regulate the presence or absence of uncalled potential witnesses.
I respectfully dissent.