Cite as 2020 Ark. App. 383

# ARKANSAS COURT OF APPEALS

DIVISION III

No. CV-19-389

| | |
|---|---|
| FREDERICK R. POTTER, INDIVIDUALLY AND AS TRUSTEE OF THE FREDERICK R. POTTER REVOCABLE TRUST ESTABLISHED SEPTEMBER 10, 2004, AND AS TRUSTEE OF THE FRED POTTER REVOCABLE TRUST ESTABLISHED JULY 10, 2013 | **Opinion Delivered:** September 9, 2020<br><br>APPEAL FROM THE SCOTT COUNTY CIRCUIT COURT [NO. 64-CV-13-54] |
| APPELLANT | |
| V. | HONORABLE DAVID H. MCCORMICK, JUDGE |
| CASSAUNDRA HOLMES, INDIVIDUALLY AND AS TRUSTEE OF THE BETTY L. POTTER REVOCABLE TRUST ESTABLISHED SEPTEMBER 10, 2004; THOMAS WRIGHT; AND KEVIN WRIGHT | AFFIRMED |
| APPELLEES | |

## ROBERT J. GLADWIN, Judge

On December 29, 2017, the Scott County Circuit Court entered an "Order for Partition Sale of Personal Property" ("partition order") that directed the appellant, Frederick Potter, to return to his house in Waldron certain items of personal property that he and his wife, Betty, had transferred to reciprocal mirror-image trusts in 2004. The order further directed Potter to notify appellee Cassaundra Holmes, the successor trustee of Betty's trust, (Betty's Trust) of the return of the personal property and to provide Holmes with a "detailed, itemized list" of all the property that he returned. Potter repeatedly failed to

comply with these directives, leading the circuit court to enter three orders holding him in contempt.

Potter has separately appealed the contempt orders. We decide all the appeals in separate opinions that we issue today. *See Potter v. Holmes*, 2020 Ark. App. 388, 609 S.W.3d 404; *Potter v. Holmes*, 2020 Ark. App. 391, 609 S.W.3d 422. Here we address Potter's challenge to the last order in the series, which the circuit court entered on March 8, 2019. Potter contends that the circuit court's finding of contempt on that date is not supported by sufficient evidence, and the imposed fine—$1,000 per day—is excessive under the circumstances. We affirm.

## I. *Factual Background*[1]

In 2004, Fred and Betty Potter signed reciprocal mirror-image trusts providing that four members of Betty's family and one member of Fred's would receive the residuary principal assets from both trusts.[2] Each settlor was to be the trustee of his or her trust during his or her lifetime, and upon the death or incapacity of either settlor, appellee Cassaundra Holmes would become successor trustee. Attached to each trust instrument was a schedule of assets for each settlor setting out the certificates of deposit, real property, and other

---

[1]On June 7, 2017, we issued an opinion in a related case, *Holmes v. Potter*, 2017 Ark. App. 378, 523 S.W.3d 397. The factual summary in that opinion provides a helpful backdrop for the partition order and the orders finding Potter in contempt. Consequently, we repeat several of those facts here.

[2]The five trust beneficiaries include appellee Cassaundra Holmes as well as appellees Thomas Wright and Kevin Wright. Vernon Wright and Allen Potter are the other two beneficiaries

property being transferred into their respective trusts. Fred's schedule of assets included 1,600 troy ounces of silver valued at between $10,000 and $15,000.

Betty died in January 2013, and Holmes became successor trustee of Betty's trust. Potter filed a complaint seeking Holmes's removal as trustee on September 20, 2013. He asserted that Holmes was not paying him the income from the trust. He further alleged that Holmes had breached her fiduciary duties by self-dealing and unnecessarily causing Betty's Trust to pay fees and to lose $300,000 in her first year as trustee. Holmes answered the complaint, denying the material allegations and pleading affirmative defenses.[3]

On April 23, 2014, Holmes filed a counterclaim against Potter, individually and as trustee of the Fred R. Potter Revocable Trust (Fred's 2004 Trust). She contended that after Betty's death, Potter attempted to get her, as trustee, to sell him assets from Betty's Trust at below market value; that Fred amended his own trust despite the parties alleged agreement to execute reciprocal trusts, and created a new trust (Fred's New Trust or Fred's 2013 Trust) to remove Betty's family members as beneficiaries under his trust and then transferred the assets from Fred's 2004 Trust to Fred's 2013 Trust without valuable consideration. In addition, she asserted claims for breach of fiduciary duty, breach of contract, and conversion of a beneficiary's share and sought actual damages in excess of $300,000. Potter answered, denying the material allegations.

---

[3]On January 20, 2015, the circuit court entered an order granting Holmes's motion for partial summary judgment as to certain allegations from Fred's complaint, finding that there was no evidence that Holmes had breached her fiduciary duties or was self-dealing or that Betty's Trust had suffered a loss of approximately $300,000. Potter voluntarily dismissed his remaining allegations on September 9, 2015.

3

The events relevant to the contempt orders began taking place shortly after Holmes filed her counterclaim. On November 13, 2014, Holmes filed a "Motion to Restrain and Enjoin [Potter] to Prevent Illegal Interference." Potter, she claimed, was interfering with her efforts to conduct an inventory of the personal property that belonged to Betty's Trust.

In the motion, Holmes alleged that when Potter and Betty executed the trust instruments in 2004, they signed bills of sale and warranty deeds that "equally divided and transferred their property and assets into the two . . . trusts, including conveying their homeplace and homeplace real property [in] Waldron, Arkansas, one-half (1/2) to Betty's Trust and one-half to [Fred's 2004 Trust]." In particular, Fred executed a bill of sale providing that he was transferring "[a]ll property [he] own[ed], including all automobiles and any and all other personal property of every kind and nature to the Trustee of the Betty L. Potter Revocable Living Trust." Holmes alleged that Betty's Trust, therefore, had a right to possession of the real and personal property, "including the right to inspect, photograph, videotape, and inventory such property at any time." Potter refused to allow her to enter the house, however, when she arrived on October 25, 2014.

The circuit court granted Holmes's motion in an order entered on December 16, 2014, observing that "there are issues of what property is in the Trusts and the present location and condition of such property." Consequently, the court ordered that Holmes "shall be allowed to inspect, photograph, and videotape the interior of the house [in Waldron] and its contents and personal property therein, the automobiles and vehicles, and the tenant-in-common property, all in an orderly fashion." The court further ordered that Potter

4

shall not interfere with, and shall allow [Holmes], and those persons who will be photographing and videotaping the house interior and its contents and the personal property therein, access to all of the said properties on Wednesday, December 17, 2014, beginning at 9:00 am. The Scott County Sheriff is hereby directed and authorized to accompany [Holmes] and her assistants during such access, with authority to arrest or remove any person or persons who in any way obstructs, interferes with, or prevents such access, inspection, photographing, or videotaping.

The circuit court also ordered Potter "to preserve, protect, and maintain the house [in Waldron] and its contents and personal property therein, the automobiles and vehicles, and the tenant-in-common property during the pendency of the case."

On April 20, 2015, Holmes filed a "Second Motion to Restrain and Enjoin [Potter], to Prevent Illegal Interference, [and] Motion to Allow Professional Inventory of Trust Personalty." According to the motion, Holmes attempted to conduct a second inspection of the house and property on December 17, 2016, whereupon she discovered that Potter "had gathered numerous strangers, meddlers, and other family members at the house, to obstruct and interfere with [the] inspection, photographing, and videotaping by [Holmes] and her assistants." The motion described several tactics that Potter's associates used to obstruct the inspection, including following Holmes and her assistants "throughout the house and property" and videotaping them as they attempted their inspection. In addition, the "strangers, meddlers, and other family members" allegedly stood in the way, requiring Holmes "to repeatedly ask [them] to move out of the way[.]" There were also several boxes in the house that were sealed and labeled as allegedly containing personal property belonging to Fred's nephew, Allen Potter. Potter also refused to allow access to both of his safes for inspection, leaving one of them, located on the second floor of his home, covered and locked.

The circuit court entered an order granting the motion on June 2, 2015. Specifically, the court found that "one of the safes being locked did not comply with the court's previous orders . . . to allow inspection of the house and personal property," and the sealed boxes "were an effort to thwart the full and complete inventory of the house contents previously ordered by the court." Accordingly, the circuit court authorized Holmes to attempt another inventory within thirty days and ordered that Potter "shall not interfere with, and shall cooperate and allow [Holmes] unrestricted and unobstructed access to the house, house property, and the contents of the house for purposes of [Holmes's] inspection and inventory." Indeed, the terms of the order indicate that the circuit court was losing its patience, specifically directing Potter

> to cooperate in allowing such inspection and inventory [by] [Holmes] and her . . . assistants, including but not limited to a) having all of the personal property in the house and available for inspection and inventory; b) having both safes in the house unlocked and open, with all safe contents available for inspection and inventory; c) having the vehicle keys available for the vehicles to be started; and d) not having any boxes sealed labeled, or placed in any way to obstruct or thwart the inspection and inventory. *Should [Potter] fail to obey these orders of the court, [Holmes] may apply for other and further relief, including asking that Potter be found in contempt of court.*

(Emphasis added.)

It did not take long for Holmes to file a motion to hold Potter in contempt. On June 17, 2015, Holmes alleged that most of the personal property in the house in Waldron, including furniture, antiques, jewelry, and precious metals, had been removed before her third attempted inspection earlier that month. Some of the personal property that remained in the house was labeled with a document that purported to be the unexecuted last will and testament of Potter's mother, and other items were concealed in closets and drawers that were labeled as containing Allen Potter's personal property.

6

The circuit court granted Holmes's motion for contempt on March 1, 2016, when following a trial, it also denied relief on Holmes's counterclaims alleging that Potter's amendments to his trust in 2013 constituted a breach of contract, breach of fiduciary duty, and conversion. We affirmed the circuit court's ruling rejecting the counterclaims in *Holmes*, 2017 Ark. App. 378, at 1, 523 S.W.3d at 399.

Shortly thereafter, on September 7, 2017, Holmes filed a "Motion for Partition of Personal Property," asserting that Betty's Trust and Potter's 2013 Trust were "in conflict" over the appropriate division of the personal property—listed in the motion—that had been removed from the house in Waldron prior to Holmes's last inventory.[4] Accordingly, she requested a judicial sale of the property and equal division of the net proceeds.

The circuit court entered an order granting the motion on December 29, 2017. In the order, the court found Potter "to have unclean hands" and directed him to return the personal property listed in the motion, as well as in a five-page attachment to the order, within ten days. The court further ordered Potter to "put each item of personal property back to where it was" in the house and to "notify [Holmes] of the date and time of return delivery of the personal property." The court also required Potter to "prepare and provide in advance to [Holmes] a detailed, itemized list of all of the personal property which [Potter] is returning to the house and property [in Waldron]." The order also provided that the property was to be auctioned once it was returned.

---

[4]Potter and Holmes agreed on a partition of the real property, and the circuit court entered an agreed order for partition sale of the real property on December 29, 2017.

On February 8, 2018, Holmes filed another motion to hold Potter in contempt. She alleged that despite the court's partition order, she "ha[d] not received notice of the date and time of the return delivery of the personal property" or "the detailed, itemized, list of all personal property which [Potter] is returning to the house and [real] property [in Waldron]." Holmes further alleged that she "did not receive notice that all of the personal property has been moved back to [Waldron] so that [she] may secure the personal property." She requested, therefore, that Potter be held in contempt and "punished accordingly," including the immediate transfer of all the personal property to her care and control so that it may be sold at a partition sale.

The circuit court heard the second motion for contempt on May 10, 2018. At the hearing, Potter admitted, through counsel, that he failed to return all the personal property listed in the partition order. The circuit court found him in willful contempt of its orders, observing from the bench that Potter has "done everything he can do to frustrate" the court's orders from the "very inception" of the case. Accordingly, the court entered a contempt order on May 16, 2018, providing that Potter faced incarceration in the Scott County Jail if he failed to comply with the partition order by the close of business on May 17, 2018.

At a status hearing on June 4, 2018, the circuit court determined that Potter still had not complied with the partition order. The court noted that Potter reported to the Scott County Jail and was later released for medical reasons. The circuit court also observed from the bench that Potter "remain[ed] in contempt" because Potter admitted, through counsel,

8

that he had not yet returned all the property in his possession or provided a list of the items that had been returned.

Consequently, on June 26, 2018, the circuit court entered another order finding that Potter "continues to be in contempt" because he had willfully "disobeyed, and continues to disobey, the previous orders of this court, including but not limited to the [partition order]." The court ordered Potter to pay a daily penalty of $1,000 for each day he remained in contempt. The court also froze the assets of Potter's 2013 trust, ordering that with the exception of the income needed for his living expenses, Potter was required to petition the court for access to the trust assets.

Holmes filed yet another motion for contempt on July 12, 2018, alleging that Potter failed to comply with all of these directives. The circuit court heard testimony on this motion on August 9, September 27, and December 3, 2018. Potter testified that, despite his previous admissions, he never signed the bill of sale that transferred his personal property to Betty's trust. He further testified that he nonetheless had returned most of the furnishings, appliances, and other personal property to the house in Waldron but conceded that he did not provide notice or an itemized list to Holmes as he was directed to do. Potter also admitted that he never paid any of the $1,000 daily penalty and that he moved some of the trust property, including precious metals, to a safe deposit box at a bank in Alma. Other testimony demonstrated that Potter did not return items to their original location in the house, and several of the returned items, including furniture, had been damaged. The testimony also established that Potter sold a 1965 Lincoln Continental and moved tractors

9

and various farm implements—all belonging to the trusts—to property owned by one of his in-laws, Belinda Bailey.

On March 8, 2019, the circuit court entered another order holding Potter in contempt. The court found that the evidence at the hearings

> clearly showed that [Potter] has sold or gave away some of the items in dispute. [Potter] has given no justification or explanation for why items were given away, sold, or what happened to the proceeds. [He] simply maintains that he cannot be in contempt of court because he no longer has these items, despite the fact that he was the person who sold or gave them away.

The court also observed that "[Potter's] arguments also ignore the fact that he and his counsel admitted that 1600 troy ounces of silver and wedding rings have not been returned and are either in a bank safety deposit box or the possession of his attorney."

On the basis of these findings, the court ruled that Potter "is still in willful contempt of this court's prior orders," and it ordered him to "immediately deposit into the registry of the Circuit Clerk of Scott County . . . One Thousand Dollars ($1,000.00) a day for each and every day of his contempt beginning on Monday, June 4, 2018." The circuit court also indicated that Potter would have to continue to pay the daily penalty "until he purges himself of contempt and complies with prior orders of this court." The circuit court further ordered the continued freeze of Potter's trust assets, and it directed Potter to "immediately return all of the missing silver coins, silver bullion, silver rounds, monies, gold bullion, and other coins to [Holmes] for inspection and [sale]." Finally, the court ordered the sale of the returned property and directed that the proceeds owed to Potter's trust "shall be held by the Clerk pending further orders of the court or until this Court finds that [Potter] has purged himself of contempt." Potter now appeals the March 8, 2019 contempt order.

10

II. *Discussion*

A. Sufficiency of the Evidence

Potter first challenges the sufficiency of the evidence supporting the finding of contempt. He asserts that it is unclear whether the court held him in civil or criminal contempt, but he contends that the evidence is insufficient in either event. In particular, Potter asserts that the partition order erroneously concluded that certain items of personal property, including a Stradivarius violin, were trust property subject to judicial sale. He also contends that the evidence admitted during the three-day hearing demonstrates that he did not willfully disobey the partition order.

We must first settle whether the circuit court held Potter in civil or criminal contempt. Criminal contempt preserves the power of the court, vindicates its dignity, and punishes those who disobey its orders. *Applegate v. Applegate*, 101 Ark. App. 289, 292, 275 S.W.3d 682, 684 (2008). In contrast, civil contempt protects the rights of private parties by compelling compliance with orders of the court made for the benefit of private parties. *Id.* We have frequently noted that even with these differing objectives, "the line between civil and criminal contempt may blur at times"; consequently, our focus for distinguishing the two "is on the character of the relief rather than the nature of the proceeding." *Id.* at 293, 275 S.W.3d at 685.

"[C]ivil contempt is designed to coerce compliance with the court's order"; therefore, a finding of civil contempt occurs when the circuit court indicates that "the contemnor may free himself or herself by complying with the order." *Id.* Indeed, "[t]his is the source of the familiar refrain that civil contemnors 'carry the keys of their prison in their

own pockets.'" *Id.* (internal citations omitted). "Criminal contempt, by contrast, carries an unconditional penalty, and the contempt cannot be purged." *Id.* Stated another way, "for civil contempt, the punishment is remedial and for the benefit of the complainant, while "for criminal contempt the sentence is punitive, to vindicate the authority of the court." *Id.* (quoting *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624 (1988)). In the case of imprisonment, for example, "it is remedial if the defendant stands committed unless and until he performs the affirmative act required by the court's order." *Id.* It is punitive, however, "if the sentence is limited to imprisonment for a definite period." *Id.*

Our analysis is similar when—as here—the circuit court imposes a fine rather than imprisonment. "A contempt fine for willful disobedience that is payable to the complainant is remedial, and therefore constitutes a fine for civil contempt, but if the fine is payable to the court, it is punitive and constitutes a fine for criminal contempt." *Id.* at 294, 275 S.W.3d at 685. A fine payable to the court is also remedial, however, "when the defendant can avoid paying the fine simply by performing the affirmative act required by the court's order." *Id.*

In the case at bar, the contempt order has both civil and criminal features. The court ordered Potter to unconditionally pay the cumulative amount of the fine as of the date of the order, directing Potter to "immediately deposit into the Registry of the Circuit Clerk of Scott County, Arkansas, One Thousand Dollars ($1,000.00) a day for each and every day of his contempt beginning on Monday, June 4, 2018[.]" The order also provided, however, that Potter's future obligation to pay the fine continued only "until such time as he purges the contempt and complies with prior orders of the court," suggesting that the fine was also

12

intended to compel Potter's compliance. That was consistent with the imposed freeze on Potter's assets, which was also to continue until Potter purged himself of the contempt. For these reasons, we find that this was both a civil and criminal contempt proceeding.

In such cases, "[w]e apply the standard of review for criminal contempt because it, as well as the burden of proof, is stricter than for civil contempt." *Shields v. Kimble*, 2016 Ark. App. 151, at 9, 486 S.W.3d 791, 798. "In a criminal contempt proceeding, proof of contempt must exist in the circuit court beyond a reasonable doubt." *Id*. On appellate review, we consider the evidence in the light most favorable to the circuit court's decision concerning the contempt and affirm if there is substantial evidence to support its decision." *Id*. at 9–10, 486 S.W.3d at 798. We leave issues of credibility, however, for the fact-finder. *Balcom v. Crain*, 2016 Ark. App. 313, at 4–5, 496 S.W.3d 405, 408.

"In order to establish contempt, there must be a willful disobedience of a valid order of the court." *Holifield v. Mullenax Fin. & Tax Advisory Grp., Inc.*, 2009 Ark. App. 280, at 3, 307 S.W.3d 608, 610. Furthermore, "[w]here a person is held in contempt for failure or refusal to abide by a judge's order, the reviewing court does not look behind the order to determine whether it is valid." *Johnson v. Johnson*, 343 Ark. 186, 197, 33 S.W.3d 492, 498 (2000). Indeed, "the fact that a decree or order is erroneous does not excuse disobedience on the part of those who were bound by its terms until reversed." *Id*.

We hold that substantial evidence supports the finding of contempt. Potter conceded that he did not provide notice or an itemized list to Holmes as the partition order directed him to do. He also admitted that he never paid any of the $1,000 daily penalty and that he moved some of the trust property, including precious metals, to a safe deposit box at a bank

13

in Alma. Other evidence demonstrated that Potter did not return items to their original location in the house, and several of the returned items, including furniture, had been damaged. The testimony also established that Potter sold a 1965 Lincoln Continental that the circuit court determined was trust property and hid tractors and various farm implements—also belonging to the trusts—on land belonging to one of his in-laws, Belinda Bailey.

Furthermore, substantial evidence demonstrates that Potter was willfully disobedient. As we set forth above, Potter resisted the court's orders throughout the proceedings, and his course of conduct, particularly as Holmes attempted to inventory the property, suggested that his disobedience was motivated by his animus toward her. Indeed, Steven Holmes, Cassaundra's husband, testified that he found a copy of a book about Ronald Gene Simmons, who massacred his family 1987, that Potter and his associates suggestively left behind when they returned some of the property to the house in Waldron. Clearly, Potter was willfully disobedient of the partition order that required him to return the property he had taken from his house in Waldron. The contempt order, therefore, is affirmed.

## B. Excessive Fine

Potter next argues that we should exercise our power to reduce the $1,000 daily fine that the circuit court imposed. In particular, he asserts that the amount of the fine, which he estimates can total $2.5 million, is disproportionate to the purpose of the contempt, which is to compel him to obey the partition order. Holmes responds that the daily fine is reasonable in light of Potter's continued refusal to obey the court's orders. She also contends that the total amount of the fine is in Potter's control—and need not be anywhere near $2.5

14

million—because the circuit court provided that he would continue to pay it only as long as he remains in contempt. To the extent the circuit court found Potter in criminal contempt, we deny his request.

"The purpose of a criminal contempt proceeding is to preserve the power and vindicate the dignity of the court and to punish for disobedience of its order." *Morris v. State*, 2017 Ark. 157, at 6, 518 S.W.3d 70, 74. Additionally, the supreme court has recognized "that the principal justification for contempt lies in the need for upholding public confidence in the majesty of the law and the integrity of the judicial system," and when the court "[has] found these ends will be met despite a reduction or even remission of [the punishment] for contempt, it has been [the court'] practice to modify the judgment." *Id.* at 6–7, 518 S.W.3d at 74. What is appropriate, moreover, "necessarily will vary based on the facts of each case." *Id.* at 7, 518 S.W.3d at 74.

Potter's $1,000 daily fine is not excessive under the circumstances. Potter's recalcitrance cannot be overstated. As we note above, he has willfully—and consistently— disregarded the circuit court's orders regarding the personal property belonging to the trusts. The fine was originally imposed in the contempt order that the circuit court entered on June 26, 2018, and at least as of the hearing on August 9, 2018, Potter had not paid any of it. Additionally, as the circuit court noted, imprisonment is no longer a viable option for compelling Potter to comply. In short, a $1,000 daily penalty until Potter complies with the partition order is indeed necessary to protect public confidence in the law and the integrity of the judicial system. His request for a reduction, therefore, is denied.

III. *Conclusion*

Substantial evidence supports the finding of contempt. The evidence at the hearing demonstrated that Potter still had not complied with the partition order, and his disobedience, which persisted throughout the proceedings, was willful. The $1000 daily fine also was not excessive under the circumstances of this case.

Affirmed.

SWITZER and VAUGHT, JJ., agree.

*Kevin L. Hickey*, for appellant.

*Skinner Law Firm, P.A.*, by: *Jack Skinner*, for appellee Cassaundra Holmes.